PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1957
_____

INES LOMANDO,
as Administratrix Ad Prosequendum of the
Estate of Laura Lomando, deceased,

                                                    Appellant

v.

UNITED STATES OF AMERICA;
STEPHANIE REYNOLDS, D.O.; TREVOR TALBERT,
M.D.;
DAVID HYPPOLITE, M.D.; PARKER FAMILY HEALTH
CENTER;
RIVERVIEW MEDICAL CENTER;
EMERGENCY PHYSICIAN ASSOCIATES NORTH
JERSEY, PC;
JOHN DOE, #1 through #5, MARY MOE #1 through #5, and
XYZ CORPORATION #1 through #5 (fictitious names
representing
unknown physicians, nurses, technicians, medical groups,
medical facilities)
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 08-4177)
Honorable Freda L. Wolfson, District Judge
_____

Submitted under Third Circuit LAR 34.1(a)
October 6, 2011

BEFORE:  McKEE, Chief Judge, and FUENTES and
GREENBERG, Circuit Judges

(Filed:  December 30, 2011)
_____

Anthony A. Lenza, Jr.
Law Offices of Carl M. Erman
618 Newark Avenue
Elizabeth, NJ 07208

    Attorneys for appellant

Tony West
Assistant Attorney General
Paul J. Fishman
United States Attorney
Karen H. Shelton
Office of the United States Attorney
402 East State Street
Trenton, NJ 08608

Mark B. Stern
Helen L. Gilbert
Attorneys, Appellate Staff,
Court Division
United States Department of Justice
Appellate Section
Room 7261
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0000

    Attorneys for appellee United States of America

George H. Cortelyou
Mark A. Petraske
Buckley & Theroux
932 State Road
Princeton, NJ 08540-0000

    Attorneys for David Hyppolite, M.D.
    and for appellees Stephanie Reynolds, D.O.,
    Trevor Talbert, M.D., and Emergency
    Physician Associates of North Jersey

Martin J. McGreevy
P.O. Box 820
Oakhurst, NJ 07755

    Attorney for David Hyppolite, M.D.

_____

OPINION OF THE COURT

3

_____

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this Court on appeal from the District Court's March 18, 2011 order implementing a comprehensive opinion granting motions that certain defendants, now the appellees in this appeal, brought seeking summary judgment. See Lomando v. United States, No. 08-4177, 2011 WL 1042900 (D.N.J. Mar. 18, 2011). Appellant Ines Lomando ("Lomando"), as administratix ad prosequendum of the estate of her daughter, Laura Lomando ("Laura"), brought this medical malpractice and wrongful death action against parties involved in Laura's health care that culminated in her death on September 21, 2006. For the reasons that follow, we will affirm in part, reverse in part, and remand the case to the District Court for further proceedings with respect to one defendant.

## II. FACTUAL and PROCEDURAL HISTORY

On August 23, August 28, September 9, and September 11, 2006, Laura sought and received treatment at the Parker Family Health Center ("Parker Health"), a free New Jersey non-profit health clinic, for an area of swelling on the left side of her neck. Three volunteer physicians at Parker Health, Drs. Zaven Ayanian, Lynn Helmer, and Timothy Sullivan, none of whom has been a party in this case, cared for Laura during these visits.

4

Effective in January 2006, and during all periods that Laura received treatment from Parker Health, the United States Department of Health and Human Services deemed those physicians to be Public Health Service ("PHS") employees pursuant to a provision of the Public Health Service Act ("PHSA"), as amended, 42 U.S.C. § 233(o). By virtue of that designation, the physicians fell within the scope of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, which precluded a suit against them individually for their services at Parker Health and substituted a suit against the United States as the exclusive remedy for their alleged malpractice.

In September 2006, Laura also sought treatment for her swollen neck and other symptoms at the Riverview Medical Center's Emergency Room Department, a facility where the physicians did not enjoy the PHSA and FTCA protections from litigation shielding the Parker Health physicians. Specifically, Laura visited Riverview on September 3, 5, 15, and 20, 2006, where Ms. Theresa Biedenbach, a physician assistant, and Drs. Stephanie Reynolds, Trevor Talbert, and David Hyppolite evaluated her. Laura's September 20 visit to Riverview would be her last, for the next day she died of spontaneous tumor lysis syndrome caused by an underlying condition of non-Hodgkins lymphoma.

Lomando filed suit under the FTCA and New Jersey law in the District Court on August 20, 2008, and filed an amended complaint on September 30, 2008.[1] She named the following

[1]Initially, Lomando filed suit in the New Jersey Superior Court,

5

defendants in the action: the United States, Parker Health, Riverview Medical Center, Drs. Reynolds, Talbert, and Hyppolite, and Emergency Physician Associates of North Jersey, P.C. ("Emergency Physician Associates"), the employer of the three individual defendants and Ms. Biedenbach. Lomando, however, did not include Ms. Biedenbach as a defendant, an omission that, as we shall see, had significant consequences in this litigation.

On February 23, 2011, the District Court granted Parker Health's unopposed motion for summary judgment predicated on its claim of immunity under the New Jersey Charitable Immunity Act, which we discuss at length below. Inasmuch as Lomando is not challenging this disposition Parker Health is not participating in this appeal. On March 18, 2011, the District Court granted summary judgment to all remaining defendants except Dr. Hyppolite who did not seek summary judgment, but in the exercise of its discretion the Court declined to exercise supplemental jurisdiction over the claims against him and therefore the action was terminated in the District Court.[2]

The District Court had different reasons for granting the contested motions for summary judgment to different defendants. The Court granted summary judgment to Riverview

---

but that court dismissed the case without prejudice on October 31, 2008.

[2]Lomando since has filed suit in the New Jersey Superior Court against Dr. Hyppolite.

Medical Center because Lomando failed to provide expert testimony against Riverview as required to establish a prima facie case of liability for medical malpractice under New Jersey law. We, however, are not concerned with this disposition as Lomando does not challenge it on this appeal. Thus, Riverview, like Parker Health, is not participating in this appeal.

The District Court addressed two distinct but related questions in dealing with Lomando's FTCA claim against the United States. The United States contended that because a provision of the FTCA, 28 U.S.C. § 2674, provides that the United States "shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim," the United States was entitled to claim any immunity available to the volunteer physicians of Parker Health. In support of this claim of immunity, the United States invoked the Volunteer Protection Act of 1997 ("VPA"), 42 U.S.C. § 14503(a), which immunizes volunteers of nonprofit organizations and governmental entities from claims alleging negligence based on acts committed within the scope of such volunteerism, and the New Jersey Charitable Immunity Act ("NJCIA"), N.J. Stat. Ann. § 2A:53A-7 (West 2011), which immunizes charitable nonprofit entities and their volunteers from liability for negligence in similar circumstances. Lomando countered that 28 U.S.C. § 2674 did not permit the United States to rely on immunities available to the volunteer physicians at Parker Health because under the FTCA "the [U]nited States stands in the shoes of the nonprofit health center and may assert only those immunities available to such centers under federal and state law." Lomando, 2011 WL 1042900, at *5.

7

The parties' contentions thus raised the independent but intertwined questions of: first, whether under the FTCA the United States assumes the role of a similarly-placed private employer or stands in the shoes of the immunized employee, and, second, whether under the FTCA the United States can assert its employees' immunities and defenses. The District Court dealt with these questions first by citing variant case law that illustrated that the United States has been equated to both a private employer and an immunized employee in FTCA cases. Shifting its analysis, the Court then examined section 2674, and stated that the text "strongly suggests that it permits the United States to assert immunities available to its employees." Id. at *6. Ultimately, however, the Court did not rule on either issue, but, instead, held that under the NJCIA both Parker Health, as a nonprofit health center, and Drs. Ayanian, Helmer, and Sullivan, as volunteer physicians at Parker Health, are immune from suit.[3] Accordingly, the Court concluded that pursuant to section 2674 the United States is entitled to the immunity from suit that the NJCIA granted, regardless of whether it derived that immunity from the immunity of Parker Health or the individual physicians.[4]

---

[3]As we have indicated, Parker Health predicated its uncontested successful motion for summary judgment on its claim to immunity under the NJCIA. Lomando does not challenge that disposition on this appeal.

[4]A firm decision on the issue of whether the United States is entitled to assert its deemed employees' defenses under 28 U.S.C. § 2674 would have been necessary if the Court had

8

The District Court held that Drs. Reynolds and Talbert, physicians who evaluated Laura at Riverview, were entitled to summary judgment because Lomando's experts' qualifications failed to meet the requirements of N.J. Stat. Ann. § 2A:53A-41 (West 2011) with respect to witnesses in medical malpractice actions. That statute ordinarily requires that in cases alleging medical malpractice by a health practitioner in a medically-recognized specialty where the care at issue involved that specialty, a plaintiff must offer expert testimony from a practitioner in that same specialty. In this regard, the Court held that because Drs. Reynolds and Talbert are board-certified specialists in emergency medicine, a specialty that the American Board of Medical Specialties recognizes, and Laura's care involved emergency medicine, Lomando was required to produce expert testimony from specialists in emergency medicine. Thus, statements that Lomando's experts, Drs. Mark Fialk and James Hayes, neither of whom is an emergency medicine specialist, submitted were insufficient to satisfy N.J. Stat. Ann. § 2A:53A-41.

Finally, the Court concluded that Emergency Physician Associates was entitled to summary judgment because Lomando had not produced any expert statements alleging that it had deviated from the applicable standard of care, apart from the testimony against Drs. Reynolds and Talbert that the Court had

predicated the United States' immunity on the VPA, because that act differs from the NJCIA in that it grants immunity only to volunteers of nonprofit organizations and not to the organizations themselves. 42 U.S.C. § 14503(a).

9

rejected.[5] In granting Emergency Physician Associates summary judgment, the Court declined to consider statements that Lomando's experts submitted alleging deviations from the applicable standard of care by Emergency Physician Associates' employee, Ms. Biedenbach, because Lomando "ha[d] not named [Ms. Biedenbach] as a defendant." Lomando, 2011 WL 1042900, at *10 n.10.

Lomando asserts that the District Court erred in holding that the United States is immune from suit under the NJCIA, as she contends that: (1) the physicians at Parker Health were not "volunteers" for purposes of the NJCIA because they were "employees" of the Public Health Service and (2) the decision permitting the United States to avail itself of the NJCIA immunity conflicted with the scheme that the FTCA envisioned and thus created a conflict between state and federal law. Lomando also argues that the Court erred in its conclusion that N.J. Stat. Ann. § 2A:53A-41 applies to the present case, and contends that Drs. Reynolds and Talbert provided care that did not involve the practice of emergency medicine. Alternatively, Lomando asserts that even if that statute applies, Dr. Fialk's qualifications were sufficient for him to give expert testimony in this case. Finally, Lomando challenges the Court's decision not to consider treatment that Ms. Biedenbach provided to Laura in

---

[5]Because Lomando had not made specific allegations against Emergency Physician Associates apart from those predicated on the treatment by the individual practitioners that it employed, the Court "treat[ed] all arguments applicable to the doctors as equally applicable to the group." Lomando, 2011 WL 1042900, at *10 n.10.

10

support of Lomando's claims against Emergency Physician Associates.

## III. JURISDICTION and STANDARD of REVIEW

The District Court had jurisdiction over Lomando's FTCA claims pursuant to 28 U.S.C. § 1346(b), and over her state law claims pursuant to 28 U.S.C. § 1367(a). We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the order granting appellees summary judgment, applying the same standard that the District Court applied. See Knopick v. Connelly, 639 F.3d 600, 606 (3d Cir. 2011); Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010). In this plenary review, we can affirm the summary judgment only if "there [wa]s no genuine issue as to any material fact and the [prevailing defendants were] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010). A genuine dispute is one that "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." Id. at 248, 106 S.Ct. at 2510. We must view the record in the light most favorable to Lomando as the non-moving party, and we must draw all reasonable inferences that the record supports in her favor. See Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). To the extent that the District Court's opinion contains

11

conclusions of law, our review is de novo. See Azur, 601 F.3d at 216.

## IV. DISCUSSION and ANALYSIS

(1) Whether the District Court erred as a matter of law in determining that the United States is immune from suit under the NJCIA, N.J. Stat. Ann. § 2A:53A-7(a), and 28 U.S.C. § 2674?

(a) The Role of the United States under the FTCA and 42 U.S.C. § 233(o)

Under 42 U.S.C. § 254b(c)(1)(A), the government "may make grants to public and nonprofit private entities for projects to plan and develop health centers which will serve medically underserved populations." As the court described in Wilson v. Big Sandy Health Care, Inc., 576 F.3d 329, 333 (6th Cir. 2009), "[i]n part due to the relatively high cost of obtaining malpractice insurance for treatment of . . . high-risk patients . . . the efforts to provide necessary medical care in . . . underserved areas initially faced significant roadblocks." In response, Congress passed the Federally Supported Health Centers Assistance Act of 1992 ("1992 Act"), Pub. L. No. 102-501, 106 Stat. 3268 (codified as amended at 42 U.S.C. §§ 201, 233).

The 1992 Act created a process by which "public and nonprofit private entities" receiving federal funds pursuant to 42 U.S.C. § 254b(c)(1)(A) and health practitioners that such entities employ "shall be deemed to be [employees] of the Public Health

12

Service." 42 U.S.C. § 233(g)(1)(A). This treatment of health care centers receiving section 254b funding and practitioners at them is highly significant, for an action against the United States under the FTCA is the exclusive remedy for persons alleging "personal injury, including death, resulting from the performance of medical . . . or related functions" by Public Health Service employees acting within the scope of their employment. 42 U.S.C. § 233(a); see also 42 U.S.C. § 233(g)(1)(A) (reiterating subsection 233(a)'s exclusivity clause).

In 1996 in an effort to "expand access to health care services to low-income individuals in medically underserved areas," H.R. Rep. No. 104-736, at 234 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 1990, 2091, Congress conferred the same deemed "employee" status and attendant FTCA coverage on a second and distinct category of persons: health practitioners who volunteer at free clinics. See Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, § 194, 110 Stat. 1936, 1988-91 (1996) (codified as amended at 42 U.S.C. § 233(o)). Congress did not condition the award of this immunity on the government making grants to the clinics. Under the HIPAA, volunteer health practitioners who at free clinics provide a "qualifying health service" "shall in providing services for the free clinic, be deemed to be [employees] of the Public Health Service." 42 U.S.C. § 233(o)(1).[6] The HIPAA likewise made explicit that an FTCA

_____

[6]Unlike a health care center receiving section 254b funding which may be deemed an employee of the PHS under 42 U.S.C. § 233(g), a free clinic is not deemed an employee of the PHS

13

action against the United States is the sole remedy through which medical malpractice and similar claims may be brought on account of the services of such volunteers. See 42 U.S.C. § 233(o)(5). In this case, the physicians who treated Laura at Parker Health were deemed employees of the Public Health Service pursuant to 42 U.S.C. § 233(o) because Parker Health is a free clinic and the physicians there provided their services as volunteers.[7] See app. at 215 (Letter from Department of Health and Human Services to Volunteers in Health (Jan. 27, 2006) (deeming Parker Health physicians employees of PHS pursuant to 42 U.S.C. § 233(o))).

Subject to exceptions not at issue in this case, the FTCA waives the sovereign immunity of the United States in its district courts for tort claims "caused by the negligent or wrongful act or

and thus the FTCA did not preclude Lomando's suit against Parker Health. See 42 U.S.C. § 233(o)(5)(B) (The subsection extending FTCA coverage to volunteers at free clinics "may not be construed as deeming any free clinic to be an employee of the Public Health Service.").

[7] 42 U.S.C. § 233(o) specifies the criteria for an entity to be regarded as a "free clinic," what conditions must be met in order for a health care practitioner to be considered a "free clinic health professional," and what constitutes a "qualifying health service." See 42 U.S.C. § 233(o)(2)-(o)(4). Because the parties do not dispute that Parker Health is a free clinic, and that the Secretary of Health and Human Services deemed the volunteer physicians who treated Laura at Parker Health to be federal employees, we do not set forth those provisions.

14

omission of any employee of the Government while acting within the scope of his office or employment, under circumstances [in which] the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Section 1346 contains two basic principles that govern FTCA claims.

First, "the FTCA does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court." In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 362 (3d Cir. 2001); see also CNA v. United States, 535 F.3d 132, 141 (3d Cir. 2008) ("The cause of action in an FTCA claim . . . must come from state tort law."). Accordingly, "the extent of the United States' liability under the FTCA is generally determined by reference to state law." In re Orthopedic, 264 F.3d at 362 (internal quotation marks and citation omitted); see also Santos ex rel. Beato v. United States, 559 F.3d 189, 193 (3d Cir. 2009) (noting that "substantively the FTCA follows state liability law"). The parties agree that because Laura's treatment and death were in New Jersey, the law of that state is applicable here.

Second, the United States is liable only to the extent that in the same circumstances the applicable local law would hold "a private person" responsible. 28 U.S.C. § 1346(b)(1). Congress reiterated that precept in 28 U.S.C. § 2674, which provides that the United States is answerable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances." See also United States v.

15

Olson, 546 U.S. 43, 46, 126 S.Ct. 510, 512 (2005) ("Our cases have consistently adhered to this 'private person' standard."). The FTCA's provision that the United States shall be liable to the same extent as "a private person" or "private individual" does not specify whether the United States is liable to the extent that a similarly-placed private employer would be liable or to the extent its employee if not an employee of the federal government would be liable. Seemingly, this omission has engendered the variant case law that the District Court cited.

We addressed this distinction between employer and employee in McSwain v. United States, 422 F.2d 1086, 1087-88 (3d Cir. 1970), in which we clarified that the United States occupies the role of a similarly-placed private employer under the FTCA:

> Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674, the United States is liable for injury caused by the negligent act of a government employee to the same extent a private employer would be liable. Such liability for the acts or omissions of a civilian or military federal employee is determined by the law of respondeat superior of the state in which the act or omission occurred.

(citing Williams v. United States, 350 U.S. 857, 76 S.Ct. 100 (1955)); see also Matsko v. United States, 372 F.3d 556, 561 (3d Cir. 2004) (distinguishing plaintiff's claim that United States failed to protect him from an intentional tort by a government employee from traditional FTCA "respondeat superior claim

16

for" the government employee's actions).[8]

---

[8]Most courts of appeals have determined consistently with this view that the FTCA imposes liability on the United States to the extent that a private employer would be liable in similar circumstances in the pertinent locality. See Haceesa v. United States, 309 F.3d 722, 729 (10th Cir. 2002) ("[T]he Government's liability under the FTCA is limited to that of a private employer under like circumstances."); Day v. Massachusetts Air Nat'l Guard, 167 F.3d 678, 681 (1st Cir. 1999) (The United States has consented to be sued under the FTCA "provided that in the same circumstances a private employer would be liable for the acts of his employee under the local law."); Taber v. Maine, 67 F.3d 1029, 1048 (2d Cir. 1995) ("Pursuant to the FTCA, courts merely determine whether analogous behavior by a private-sector employee would give rise to some form of fault-based vicarious liability on the part of a private-sector employer."); Johnson v. Sawyer, 47 F.3d 716, 730 (5th Cir. 1995) (en banc) ("All FTCA liability is respondeat superior liability. . . . Under the FTCA, the United States is not liable if the private employer would not be liable pursuant to local law."). But courts do not always follow this approach for in Knowles v. United States, 91 F.3d 1147, 1150 (8th Cir. 1996), the court held that the United States is liable to the extent the immunized employee would be liable under local law. But see St. John v. United States, 240 F.3d 671, 676 (8th Cir. 2001) ("The FTCA is a limited waiver of sovereign immunity, allowing the federal government to be sued for the actions of 'any employee of the Government while acting within the scope of his office or employment' under circumstances where the

The Supreme Court likewise has described the United States' role under the FTCA as equivalent to that of an employer answering under respondeat superior liability. In Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 427, 115 S.Ct. 2227, 2232 (1995), the Court observed that where the United States certifies in response to an FTCA claim that an employee was acting within the scope of his employment with respect to his actions concerning the claim, "the United States, by certifying, is . . . exposing itself to liability as would any other employer at common law who admits that an employee acted within the scope of his employment." (citing Restatement (Second) of Agency § 219 (1958)) (emphasis added); Lamagno, 515 U.S. at 420, 115 S.Ct. at 2229 ("Generally, [FTCA] cases unfold much as cases do against other employers who concede respondeat superior liability."); see also Laird v. Nelms, 406 U.S. 797, 801, 92 S.Ct. 1899, 1901-02 (1972) ("Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of respondeat superior . . . .").

Looking to the text of the FTCA, we note that the act shadows precisely the common law of respondeat superior liability, providing that the United States is subject to suit for the negligent acts of "any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1) (emphasis added); see 1 S. Speiser, C. Krause, & A. Gans, The American Law of Torts § 4.3, pp. 581-82 (2003) ("[I]t is hornbook law that the doctrine of respondeat superior

United States would be liable if it were a private employer.").

18

renders an employer or master vicariously liable for a tort committed by his employee or servant while acting within the scope of employment."); Restatement (Third) of Agency § 2.04 ("An employer is subject to liability for torts committed by employees acting within the scope of their employment."). Thus, the plain language of the FTCA, which treats the United States as liable for the tortious actions of its employees, creates a remedial scheme under which the United States would be liable as an employer in like circumstances. See also 28 U.S.C. § 2671 note ("The United States, through the Federal Tort Claims Act, is responsible to injured persons for the common law torts of its employees in the same manner in which the common law historically has recognized the responsibility of an employer for torts committed by its employees within the scope of their employment.") (emphasis added).

In sum, the FTCA provides that the United States will be liable to the extent that a private employer would be liable in similar circumstances in the same locality. In this case, then, the United States stands in the shoes that a similarly-placed private employer of the physicians, i.e., a free non-profit health center, would stand and answers for the allegedly tortious conduct of the United States' deemed employees, the volunteer physicians at that health center.[9] We turn now to the question of what

---

[9]This case appears to be the first precedential opinion to address squarely the interaction of 42 U.S.C. § 233(o) and the FTCA. The District Court stated that Knowles v. United States, 29 F.3d 1261 (8th Cir. 1994), stands for the proposition that the United States "stands in the shoes of both health institutions and physicians" in cases such as this one. Lomando, 2011 WL

19

defenses the United States may invoke in that position.

(b) The Defenses of the United States under the FTCA

In 1988, Congress clarified the terms of the United States' waiver of sovereign immunity under the FTCA through the Federal Employees Liability Reform and Tort Compensation

1042900, at \*5 n.6 (citing <u>Knowles</u>, 29 F.3d at 1265 ("In this case, the United States is standing in the shoes of a hospital, a doctor, two nurses, and the [Medical Service Specialists].")). We think, however, that <u>Knowles</u> is of limited precedential value here as it did not deal with private physicians who were "deemed" federal employees under 42 U.S.C. § 233(<u>o</u>), but rather involved a suit against a military base hospital and its employees.  <u>See</u> 29 F.3d at 1262-63.  Though there is a dearth of guidance on the issue of how to characterize a similarly-placed private employer of a volunteer physician deemed an employee of the PHS under 42 U.S.C. § 233(<u>o</u>), it seems that equating the United States to a free clinic, rather than a hospital or practice group that employs the physicians for compensation, is the only way to ensure that the United States' liability under the FTCA is the same as that of a "private person" in similar circumstances.  If the United States is treated as a paying employer, the entire statutory predicate of this case, that the physicians were deemed employees precisely because they were volunteers at a free clinic, must be ignored, and, further, the United States' liability would be expanded beyond that of a similarly-placed entity, simply by virtue of application of the FTCA.

Act of 1988 ("Westfall Act"), Pub. L. No. 100-694, 102 Stat. 4563 (codified as amended at scattered portions of the United States Code). The Westfall Act provided for absolute immunity to federal employees in the wake of <u>Westfall v. Erwin</u>, 484 U.S. 292, 108 S.Ct. 580 (1988), by making suit against the United States under the FTCA the exclusive remedy for negligent or wrongful acts by federal employees committed within the scope of employment.[10] As significant to this case, the Westfall Act also added the following provision to the FTCA:

> With respect to any claim under [the FTCA], the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled.

28 U.S.C. § 2674. The text of section 2674 is straightforward, and its import clear. <u>See United States v. Gregg</u>, 226 F.3d 253, 257 (3d Cir. 2000) ("If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends

---

[10]In <u>Westfall</u>, the Court held that government employees were absolutely immune only from suits based on acts that were both within the scope of employment and discretionary in nature. 484 U.S. at 300, 108 S.Ct. at 585. The Westfall Act eliminated the requirement that for the employee to have immunity the allegedly wrongful acts must have involved the exercise of discretion.

there and the statute is enforced according to its terms."). The United States as the employer may assert any defense rooted in judicial or legislative immunity which would have been available to its employee had he not been a deemed employee of the PHS and, instead, had been a defendant in the action at hand. In this case, section 2674 thus allows the United States to avail itself of any judicially- or legislatively-based immunity to which the individual physicians — its employees for purposes of the FTCA — would have been entitled if they were the defendants. This provision for immunity is superimposed on Congress's intent in enacting the FTCA to position the United States for liability purposes in the position of a private employer.

It is important to note that section 2674 does not state exhaustively those defenses to which the United States is entitled; rather, it reserves explicitly the United States' right to assert "any other defenses to which [it] is entitled." The "other defenses" to which the United States is entitled include not only those defenses the United States may invoke independently, but also any defenses available to a similarly-placed private employer answering for the alleged torts of its employee. In this vein, Congress clarified in the report accompanying the Westfall Act that "the specific designation of these immunities does not imply that traditional common law defenses are not available. . . . [O]rdinary tort defenses, such as contributory negligence, assumption of risk, estoppels, waiver and res judicata, as applicable, continue to be available to the United States." H.R. Rep. No. 100-700, at 4 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5948; see also id., at 7, 1988 U.S.C.C.A.N. at 5952 (28 U.S.C. § 2674 "would authorize the United States to utilize all of the defenses to which it is independently entitled.").

22

Defenses available to a similarly-placed employer may be rooted in the common law, or they may be created statutorily, as in the case of the immunity conferred on charitable nonprofit entities and their volunteers under the NJCIA. Of course, the actual availability, <u>vel non</u>, of these defenses generally will depend on the law of the state in which the allegedly wrongful act occurred because the applicable state law defines the scope of the United States' liability under the FTCA. <u>See, e.g.,</u> <u>Rodriquez v. United States</u>, 823 F.2d 735, 741-44, 745 (3d Cir. 1987) (New Jersey law on comparative negligence established extent to which recovery by plaintiffs against United States could be limited in FTCA case).

Having determined the scope of the defenses available to the United States in an action under the FTCA, we decide now whether the NJCIA provides an immunity defense in this case. The NJCIA, N.J. Stat. Ann. § 2A:53A-7, confers immunity on nonprofit entities organized for a charitable purpose as well as on the volunteers of those entities. The act reads, in pertinent part:

> No nonprofit corporation, society or association organized exclusively for . . . charitable . . . purposes or its . . . volunteers shall . . . be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation . . . where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation . . . .

N.J. Stat. § 2A:53A-7(a). A further provision of the NJCIA

23

provides similarly that "no person who provides volunteer services or assistance for any nonprofit corporation . . . shall be liable in any action for damages as a result of his acts of commission or omission arising out of and in the course of his rendering the volunteer service or assistance." N.J. Stat. § 2A:53A-7.1(b).[11]

Lomando concedes that if the volunteer physicians "were not deemed federal employees and if they were named defendants in a state court action [for the injuries involved in this case] they would be immune from liability under [the NJCIA]." Appellant's br. at 13.[12] Nevertheless, Lomando contends that "once [the volunteer physicians] are deemed federal employees, they should no longer be viewed as volunteers." Id. at 12. Lomando bases this argument on the theory that "the definition of an employee is directly contrary to that of a volunteer," with the former expecting some form of compensation and the latter rendering his or her services without such an expectation. Id. Lomando asserts, as well, that a decision applying the statutory immunity derived from the

[11]Although Parker Health is a free clinic, there is no requirement in the NJCIA that an entity must be free to be organized for a charitable purpose.

[12]Because Lomando does not dispute that all aspects of the NJCIA would have been satisfied here in the absence of the deemed employee designation, we do not review the District Court's conclusion that the requirements of the NJCIA were satisfied. Consequently, we treat Parker Health and its volunteers as being immune from suit under New Jersey law.

NJCIA in this case would contravene the Supremacy Clause of the United States Constitution, U.S. Const. art. VI cl. 2, because the NJCIA provides an immunity defense that is inconsistent with the remedial scheme of recovery in 42 U.S.C. § 233 and the FTCA. Id. at 16. We find both of these contentions unpersuasive.

Lomando fundamentally misapplies the effect of the physicians' "deemed" employee designation. Under 42 U.S.C. § 233(o), a volunteer physician is "deemed to be an employee of the Public Health Service" but only "[f]or purposes of [42 U.S.C. § 233]." Section 233 does not provide for remuneration for employees of the PHS; rather, that section addresses only "[c]ivil actions or proceedings against commissioned officers or employees" of the PHS, and provides that an action under the FTCA is the exclusive basis for such suits. See 42 U.S.C. § 233(a). Accordingly, persons "deemed" to be employees of the PHS under 42 U.S.C. § 233(o) are not federal employees receiving compensation for their work by the federal government to the end that they are no longer rendering their services as "volunteers" at a free clinic. To the contrary, the employee designation is a legal construct effective only for the purposes of section 233. In addressing the status of health care practitioners at clinics receiving section 254b funding who similarly are deemed PHS employees, we have noted that "[h]ealth care workers at private clinics, even ones receiving some federal aid, are not federal employees in the usual sense. After all, they do not perform a traditional government function or work in a government building, and they are not on the federal payroll." Santos, 559 F.3d at 200 (quoting Santos ex rel. Beato v. United States, 523 F. Supp. 2d 435, 442 (M.D. Pa.

25

2007)) (internal quotation marks omitted).[13]

Lomando's contention that the Supremacy Clause abrogates the NJCIA in the context of this case likewise fails. The Supremacy Clause invalidates state law that "interferes with or is contrary to federal law." Free v. Bland, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092 (1962) (citing Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 210, 6 L.Ed. 23 (1824)). Federal law can supersede state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption. Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010) (citing Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 2375 (1985)). Lomando bases her Supremacy Clause argument on conflict preemption, which "nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Farina, 625 F.3d at 115 (quoting Hillsborough Cnty., 471 U.S. at 713, 105 S.Ct. at 2375). Lomando urges that under 42 U.S.C. § 233(a) Congress intended to provide a means of financial recovery for tort victims injured by volunteer physicians and "[r]ecoveries that

[13]This is, of course, to say nothing of the fact that Lomando's position on this point, if accepted, would render null the entirety of 42 U.S.C. § 233(o) dealing with volunteers at free clinics. Under 42 U.S.C. § 233(o)(2)(D), an individual must not receive recompense, i.e., he or she must render "[v]olunteer services," to be deemed an employee of the PHS. In Lomando's view, however, once deemed an "employee" by virtue of such volunteerism, the individual is no longer a "volunteer."

26

are allowed under [s]ection 233(a) should not be immunized by state law," because that immunization leaves victims without a remedy. Appellant's br. at 17.

It is true that Congress has waived the sovereign immunity of the United States for tort actions against volunteer physicians "deemed" federal employees under 42 U.S.C. § 233(o), and thereby has provided that a claim against the United States under the FTCA is an injured party's exclusive remedy in such circumstances. However, 28 U.S.C. § 2674, which permits the United States to invoke the defense provided by the NJCIA, circumscribes that waiver. See United States v. Jicarilla Apache Nation, __ U.S. __, __, 131 S.Ct. 2313, 2323 (2011) ("The Government consents to be liable to private parties 'and may yield this consent upon such terms and under such restrictions as it may think just.'" (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 283 (1856)). Section 2674 clearly expresses Congress' objectives in this regard, and that intent is made all the more forceful by the legislative history surrounding the enactment of 42 U.S.C. § 233(o). In addressing subsection 233(o), Congress stated:

> The Committee is aware that each of the 50 states have passed laws to limit the liability of volunteers in a variety of circumstances. This provision does not preempt those laws beyond the preemption provided in the Federal Tort Claims Act. Instead, the United States shall be liable in the same manner and to the same extent as a private individual in the same circumstances under State law.

27

H.R. Rep. No. 104-736, at 279, 1996 U.S.C.C.A.N. at 2092 (emphasis added).

Application of the NJCIA coupled with the exclusive force of the FTCA preclude Lomando from making a recovery from the United States predicated on the alleged malpractice of the Parker Health volunteer physicians. Contrary to Lomando's contentions, however, this outcome is not at all inconsistent with Congress' objectives. See H.R. Rep. No. 100-700, at 6, 1988 U.S.C.C.A.N. at 5950 ("The 'exclusive remedy' provision of [the FTCA] is intended to substitute the United States as the solely permissible defendant . . . . Therefore, suits against Federal employees are precluded even where the United States has a defense which prevents an actual recovery.") (emphasis added); see also United States v. Smith, 499 U.S. 160, 166, 111 S.Ct. 1180, 1185 (1991) ("Congress recognized that the required substitution of the United States as the defendant in tort suits filed against Government employees would sometimes foreclose a tort plaintiff's recovery altogether."). Accordingly, in upholding the District Court decision applying the NJCIA to bar this action against the United States, we are not making a ruling in any way contrary to the terms or intent of 42 U.S.C. § 233(o) or the FTCA. Therefore, the Supremacy Clause does not bar the result we reach in this case.

In summary, we hold that the District Court did not err in holding that the United States was immune from this suit. The United States is entitled to the protection of the immunity the NJCIA provides because a similarly-placed private employer

would be entitled to that defense and the United States' deemed employees in this case, the individual physicians, would be entitled to that defense as well.[14]

> (2) Whether the District Court erred in deciding that the treatment provided to Laura by Drs. Reynolds and Talbert constituted emergency medicine such that N.J. Stat. Ann. § 2A:53A-41 applies?  If the Court did not so err, did one of Lomando's experts, Dr. Fialk, satisfy N.J. Stat. Ann. § 2A:53A-41?

To state a prima facie case of medical malpractice in New Jersey, ordinarily "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury."  Gardner v. Pawliw, 696 A.2d 599, 608 (N.J. 1997) (citations omitted).  As part of an effort at comprehensive tort reform and to counter a severe increase in medical malpractice liability insurance premiums, in 2004 the New Jersey Legislature enacted the New Jersey Medical Care Access and Responsibility and Patients First Act ("Access and Responsibility Act"), N.J. Stat. Ann. §§ 2A:53A-37 to -42 (West 2011).  Among other things, the Access and Responsibility Act "provides more detailed standards for a testifying expert . . . , generally requiring the challenging expert to be equivalently-qualified to the defendant."  Ryan v. Renny, 999 A.2d 427, 436

---

[14]Inasmuch as we conclude that the United States is immune from suit under the NJCIA, we need not determine whether the VPA also may have provided it with an immunity defense.

29

(N.J. 2010).[15]

The legislature set forth these standards in N.J. Stat. Ann. § 2A:53A-41, which provides, in relevant part:

> In an action alleging medical malpractice, a person shall not give expert testimony . . . on the appropriate standard of practice or care unless the person is licensed as a physician or other health care professional in the United States and meets the following criteria:
>
>> (a) If the party against whom or on whose behalf the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties ['ABMS'] or the American Osteopathic Association ['AOA'] and the care or treatment at issue involves that specialty or subspecialty recognized by the [ABMS] or [AOA], the person providing the testimony shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty, recognized by the [ABMS] or the [AOA],

---

[15]These standards apply also to an affidavit of merit supporting a malpractice claim that a New Jersey statute requires for the initiation of a malpractice action, N.J. Stat. Ann. § 2A:53A-27 (West 2011), but compliance with that statute is not raised as an issue in this case.

as the party against whom or on whose behalf the testimony is offered, and if the person against whom or on whose behalf the testimony is being offered is board certified and the care or treatment at issue involves that board specialty or subspecialty recognized by the [ABMS] or the [AOA], the expert witness shall be:

> (1) a physician credentialed by a hospital to treat patients for the medical condition, or to perform the procedure, that is the basis for the claim or action; or

> (2) a specialist or subspecialist recognized by the [ABMS] or the [AOA] who is board certified in the same specialty or subspecialty recognized by the [ABMS] or the [AOA], and during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to either:

>> (a) the active clinical practice of the same health care profession in which the defendant is licensed, and if

31

the defendant is a specialist or subspecialist recognized by the [ABMS] or the [AOA], the active clinical practice of that subspecialty recognized by the [ABMS] or the [AOA]; or

(b) [the instruction of students in an accredited medical school, accredited health professional school, accredited residency program or research program] in the same health care profession in which the defendant is licensed, and, if that party is a specialist or subspecialist recognized by the [ABMS] or the [AOA] [one of the aforementioned programs] in the same specialty or subspecialty recognized by the [ABMS] or the [AOA]; or

(c) both.

N.J. Stat. Ann. § 2A:53A-41(b) also governs the scenario in which the defendant health-care provider is a "general practitioner." Thus, "[t]he statute sets forth three distinct

32

categories embodying this kind-for-kind rule: (1) those who are specialists in a field recognized by the [ABMS or AOA] but who are not board certified in that specialty; (2) those who are specialists in a field recognized by the ABMS [or AOA] and who are board certified in that specialty; and (3) those who are 'general practitioners.'" Buck v. Henry, 25 A.3d 240, 247 (N.J. 2011).

Drs. Reynolds and Talbert are board-certified specialists in emergency medicine, a specialty that the ABMS and the AOA recognize.[16] Lomando submitted statements by two experts, Drs. Fialk and Hayes, neither of whom is a specialist in the field of emergency medicine, in the District Court. Lomando contended, however, that N.J. Stat. Ann. § 2A:53A-41 did not apply to her claims against Drs. Reynolds and Talbert because they provided care that did not "involve" their specialty of emergency medicine. The Court rejected this argument, finding that they rendered care on September 5, 15, and 20 that constituted the practice of emergency medicine, as the ABMS and American Board of Emergency Medicine ("ABEM") define that field.[17] Lomando contends that the Court erred in making

[16]Dr. Reynolds is a doctor of osteopathic medicine; thus, the AOA certified her in emergency medicine.

[17]As noted, Laura visited the Riverview Medical Center's Emergency Room Department on September 3, 5, 15, and 20, 2006. Ms. Biedenbach evaluated Laura on September 3, see appellant's br. at 5, and because the District Court refused to consider the treatment Ms. Biedenbach provided, the Court did not include the events of September 3 in its discussion of N.J.

33

this finding, and argues that the physicians' treatment of Laura on September 5 and 15 "involved [the] general skill and knowledge of a physician and did not require the specialized training of an emergency department physician." Appellant's br. at 9.[18]

Lomando now raises an additional argument that she did not present squarely to the District Court. Lomando contends that because Dr. Fialk "is board certified in oncology and has hospital appointments to treat patients with cancer" and because "the basis" for Lomando's claim is the "failure to diagnose lymphoma," Dr. Fialk's qualifications satisfy N.J. Stat. Ann. § 2A:53A-41(a)(1). Appellant's br. at 18-19. We address these arguments in turn.[19]

---

Stat. Ann. § 2A:53A-41.

[18]Lomando seemingly has abandoned her contention that the care rendered on September 20 did not constitute emergency medicine. See appellant's br. at 9, 23.

[19]"'Generally, failure to raise an issue in the District Court results in its waiver on appeal.'" Webb v. City of Philadelphia, 562 F.3d 256, 263 (3d Cir. 2009) (quoting Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006)). Nonetheless, the waiver rule "is one of discretion rather than jurisdiction," and "it may be relaxed whenever the public interest . . . so warrants." Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 834-35 (3d Cir. 2011) (internal quotation marks and citations omitted); see also Webb, 562 F.3d at 263. When considering whether to address an issue

34

(a) The Care Provided by Drs. Reynolds and Talbert Involved Emergency Medicine.

The ABMS defines the specialty of emergency medicine as:

> the immediate decision making and action necessary to prevent death or any further

---

not previously raised, a court considers whether the issue is "a pure question of law . . . where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance." Huber, 469 F.3d at 74-75. In considering a waiver claim, a court takes into account also the dual purposes of the doctrine: "ensuring that the necessary evidentiary development occurs in the trial court, and preventing surprise to the parties when a case is decided on some basis on which they have not presented argument." Barefoot, 632 F.3d at 835 (citing Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721 (1941)); see also Huber, 469 F.3d at 75.

It would not serve the purposes of the waiver rule to apply it in this case. Evidentiary development is largely irrelevant to the question of law at issue here, and appellees were on notice from the inception of this case that the application of N.J. Stat. Ann. § 2A:53A-41 was at issue, even if Lomando did not invoke the specific paragraph we now consider. In this vein, appellees explicitly argued in the District Court that Lomando's experts did not satisfy N.J. Stat. Ann. § 2A:53A-41(a)(1). See app. at 300.

35

> disability in both the pre-hospital setting by directing emergency medical technicians and in the emergency department. This special[ty involves] immediate recognition, evaluation, care, stabilization and disposition of a generally diversified population of adult and pediatric patients in response to acute illness and injury.

Lomando, 2011 WL 1042900, at \*12; see also Buck, 25 A.3d at 249 (referencing the ABMS definition of "emergency medicine"). The ABEM describes the practice of emergency medicine as "begin[ning] with the recognition of patterns in the patient's presentation that points to a specific diagnosis or diagnoses. Pattern recognition is both the hallmark and cornerstone of the clinical practice of Emergency Medicine, guiding the diagnostic tests and therapeutic interventions during the entire patient encounter." Lomando, 2011 WL 1042900, at \*12 (emphasis in original deleted).[20] Bearing in mind these definitions of emergency medicine, we agree with the District Court that Drs. Reynolds and Talbert provided Laura with care involving the practice of emergency medicine.

On September 5, Laura arrived at Riverview Medical

---

[20]The ABEM is "one of 24 medical specialty certification boards recognized by the [ABMS]" and is the entity actually responsible for certifying physicians in emergency medicine. http://www.abem.org/PUBLIC/portal/alias__Rainbow/lang__en -US/tabID__3333/DesktopDefault.aspx. Because we are not aware of an AOA definition of emergency medicine, we reference only the ABMS and ABEM definition.

Center's Emergency Department complaining of the acute symptoms of chest pain and tightness, nausea, diarrhea, and shortness of breath. In response, Dr. Reynolds examined Laura, ordered that she be given medication intravenously for her chest tightness, and instructed her to stop taking certain medication, the consumption of which coincided with the advent of Laura's chest tightness, nausea, and diarrhea. During the examination, Dr. Reynolds became aware that Laura's left lymph node was swollen. Once Laura's nausea and chest pain improved, she was discharged from the hospital with a working diagnosis of reaction to medication, muscle strain, and a swollen salivary duct. In line with the ABMS definition of emergency medicine, Laura's symptoms on this visit were largely acute, and Dr. Reynolds engaged in the task of "evaluation" and "stabilization" of Laura in response to those symptoms.

On September 15, Laura presented to Riverview's Emergency Department with a history of Epstein-Barr Syndrome, a fever, and showing signs of dehydration. Laura's incoming patient report notified Riverview that she was suspicious for meningitis, had neck pain, and an enlarged lymph node on the left side of her neck. Upon examination, Dr. Talbert observed that Laura had left anterior adenopathy. Dr. Talbert ordered that fluids and medication be given to Laura to treat her dehydration and fever, and ordered that she be given a mononucleosis test. Once Laura's fever decreased and she was in stable condition, she was discharged from the hospital. Again, consistently with the ABMS definition of emergency medicine, Dr. Talbert engaged in the "immediate decision making and action necessary" to care for and ultimately "stabiliz[e]" Laura. Further, based on Laura's pattern of

symptoms at that visit, Dr. Talbert ordered the diagnostic test for mononucleosis.

Though we do not hold that treatment provided in an emergency room necessarily involves the practice of emergency medicine, the care that Drs. Reynolds and Talbert provided was emergency medicine and falls within the practice of emergency care as the applicable certifying bodies define that field. Accordingly, the District Court correctly concluded that N.J. Stat. Ann. § 2A:53A-41(a) applied.

(b) Dr. Fialk's qualifications do not satisfy N.J. Stat. Ann. § 2A:53A-41(a)(1).

We turn now to Lomando's contention, that even if N.J. Stat. Ann. § 2A:53A-41(a) applies, Dr. Fialk's qualifications meet the requirements of N.J. Stat. Ann. § 2A:53A-41(a)(1). As stated, Drs. Reynolds and Talbert are board-certified specialists in emergency medicine; thus, Lomando was required to provide testimony prepared by experts who met the requirements imposed on experts who testify against board-certified specialists. There is a question, however, as to what those requirements may be. In Lomando's view, an expert offering testimony against a board-certified specialist need not share that specialty, but rather the expert only must satisfy the hospital appointment mandate of N.J. Stat. Ann. § 2A:53A-41(a)(1) or the board certification plus clinical or instructional experience requirements of N.J. Stat. Ann. § 2A:53A-41(a)(2). In this regard, Lomando contends that because Dr. Fialk has "hospital appointments to treat patients with cancer," appellant's br. at 18, his qualifications satisfy the mandates of N.J. Stat. Ann. §

2A:53A-41(a)(1).

The Supreme Court of New Jersey has observed that N.J. Stat. Ann. § 2A:53A-41 is "far from a model of clarity." Buck, 25 A.3d at 247. In Ryan, however, that court had provided its interpretation of the statute, describing it thusly:

> [W]here the defendant is a specialist or subspecialist, the person providing the testimony against him 'shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty[.]' N.J. Stat. Ann. § 2A:53A-41(a). Further, where the defendant is board certified, the witness against him must also be board certified in the same specialty or subspecialty, [Here, the Court inserted the following footnote: 'Alternatively, the witness shall be "a physician credentialed by a hospital" to treat the condition or perform the procedure that is the basis of the claim. N.J. Stat. Ann. § 2A:53A-41(a)(1).'], and 'during the year immediately preceding the date of the occurrence that is the basis of the claim or action, shall have devoted a majority of his professional time to' active clinical practice or teaching of the specialty or subspecialty. N.J. Stat. Ann. § 2A:53A-41(a)(2).

999 A.2d at 440 (original emphasis omitted and current emphasis added); see also Buck, 25 A.3d at 247 (labeling the requirements imposed by N.J. Stat. Ann. § 2A:53A-41(a)(1) and

39

-41(a)(2) as "additional qualifications" an expert witness must meet beyond those delineated in N.J. Stat. Ann. § 2A:53A-41(a)); New Jersey State Bar Ass'n v. State, 902 A.2d 944, 952-53 (N.J. Super. Ct. App. Div. 2006) (adopting the same formulation for N.J. Stat. Ann. § 2A:53A-41). Thus, the Supreme Court of New Jersey has construed N.J. Stat. Ann. § 2A:53A-41(a) to require that an expert offering testimony against a board-certified specialist share that specialty and meet the requirements of either N.J. Stat. Ann. § 2A:53A-41(a)(1) or -41(a)(2). In this way, the court made clear that the hospital credential provision of N.J. Stat. Ann. § 2A:53A-41(a)(1) is an alternative to the board certification plus teaching or clinical practice requirements of N.J. Stat. Ann. § 2A:53A-41(a)(2), but it is not an alternative to the specialization requirement of N.J. Stat. Ann. § 2A:53A-41(a).

Accordingly, Dr. Fialk may not offer testimony against Dr. Reynolds or Dr. Talbert regarding the care provided by those physicians to Laura because he is not a specialist in the field of emergency medicine.

> (3) Whether the District Court erred in refusing to consider the treatment Ms. Biedenbach rendered for purposes of Lomando's claim against Ms. Biedenbach's employer, Emergency Physician Associates? If the Court so erred, does N.J. Stat. Ann. § 2A:53A-41 apply to testimony concerning Ms. Biedenbach?
>
> (a) Lomando was not required to name Ms. Biedenbach as a defendant.

40

The District Court stated that it would "not consider the treatment provided by Ms. Biedenbach in connection with" Emergency Physician Associates' summary judgment motion solely because Lomando "ha[d] not named [Ms. Biedenbach] as a defendant." Lomando, 2011 WL 1042900, at *10 n.10. Lomando contends that the Court's refusal to consider treatment that Ms. Biedenbach provided in support of Lomando's claim against her employer, Emergency Physician Associates, was legal error, and we agree.

New Jersey courts apply the common law principle of respondeat superior liability, and thus in that state "an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment." Carter v. Reynolds, 815 A.2d 460, 463 (N.J. 2003) (citing Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 461-62 (N.J. 1993)). New Jersey law, however, does not include a requirement that a litigant include the allegedly negligent employee as a defendant in an action seeking to impose respondeat superior liability on an employer. See Zukowitz v. Halperin, 821 A.2d 527, 530 (N.J. Super. Ct. App. Div. 2003) ("The judge erred in dismissing plaintiff's common law claim based upon vicarious liability for the negligence of defendant's employees. See, e.g., Printing Mart-Morristown v. Sharp Elecs. Corp., [563 A.2d 31, 47-48 (N.J. 1989)]. Whether the [employees] were named as defendants is legally irrelevant to defendant's liability for their conduct under the doctrine of respondeat superior. See McFadden v. Turner, [388 A.2d 244 (N.J. Super. Ct. App. Div. 1978)]."); Marion v. Borough of Manasquan, 555 A.2d 699, 702 (N.J. Super. Ct. App. Div. 1989)

41

("In cases not involving the [Tort Claims Act, N.J. Stat. Ann. § 59:2-2 (West 2011)][21] in which a plaintiff seeks recovery on the theory of respondeat superior, there is no requirement that the plaintiff join as a defendant the individual upon whose act or failure to act vicarious liability is predicated. Indeed, the plaintiff has the option to sue the party vicariously liable for the conduct of an agent in one law suit and thereafter, pursue the agent in a separate suit. In such cases, the concept of mandatory joinder does not apply." (citing McFadden, 388 A.2d 245-46)); Moss v. Jones, 225 A.2d 369, 372 (N.J. Super. Ct. App. Div. 1966) ("We conclude that a person injured by the negligence of an agent or servant may sue the agent or servant and the principal or master in one suit, or may proceed against them in separate suits . . . ."); see also Great Northern Ins. Co. v. Leontarakis, 904 A.2d 846, 853 (N.J. Super. Ct. App. Div. 2006) ("The rationale of the rule — 'that plaintiff is entitled to pursue all those who are independently liable to him for his harm until one full satisfaction is obtained' — is equally applicable whether the liability is actual or vicarious." (quoting McFadden, 388 A.2d at 247)).[22] Furthermore, "[i]t is well-established that

---

[21] The Tort Claims Act deals with claims against public entities and employees and is not applicable here.

[22] In Cogdell v. Hospital Center at Orange, 560 A.2d 1169, 1178 (N.J. 1989), the New Jersey Supreme Court adopted a mandatory joinder rule requiring that "to the extent possible" New Jersey courts "determine an entire controversy in a single judicial proceeding[,]" that determination "necessarily embrac[ing] not only joinder of single related claims between the parties but also joinder of all persons who have a material

[Federal Rule of Civil Procedure] 19 does not require the joinder of joint tortfeasors[;] [n]or does it require joinder of principal and agent." Nottingham v. Gen. Am. Commc'ns Corp., 811 F.2d 873, 880 (5th Cir. 1987) (per curiam) (citations omitted); see also Temple v. Synthes Corp., Ltd., 498 U.S. 5, 7, 111 S.Ct. 315, 316 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit.").

Accordingly, we hold that the District Court erred when it excluded from consideration the care that Ms. Biedenbach provided in assessing Lomando's claim against Emergency Physician Associates. The Court was not precluded from taking into account Ms. Biedenbach's care in considering Lomando's claim against her employer notwithstanding Ms. Biedenbach's non-party status.

> (b) N.J. Stat. Ann. § 2A:53A-41 does not apply to physician assistants.

We now reach the final issue in this appeal, which also relates to Ms. Biedenbach: whether N.J. Stat. Ann. § 2A:53A-41 applies to expert testimony offered to evaluate the care she

---

interest in the controversy." That rule proved to be highly controversial and has been replaced by a mechanism of disclosure whereby "a party to any litigation is obligated to reveal the existence of any non-party who should be joined or who might have 'potential liability to any party on the basis of the same transactional facts.'" Kent Motor Cars, Inc. v. Reynolds and Reynolds, Co., 25 A.3d 1027, 1037 (N.J. 2011).

provided. Lomando contends that N.J. Stat. Ann. § 2A:53A-41 does not apply to non-physicians, while appellee Emergency Physician Associates asserts that the statute encompasses physician assistants. Because the question of whether N.J. Stat. Ann. § 2A:53A-41 applies to Ms. Biedenbach is a potentially dispositive legal question in this case, we will address the matter.

To the best of our knowledge, the New Jersey Supreme Court has yet to confront explicitly the question of whether N.J. Stat. Ann. § 2A:53A-41 applies only to physicians, or whether its scope is broader.[23] "In the absence of a controlling decision by the [New Jersey] Supreme Court, we must predict how it would rule if faced with the issue." See Spence v. ESAB Grp.,

---

[23]Notably in Buck the New Jersey Supreme Court appeared to assume that the statute applied only to physicians. 25 A.3d at 247 ("The basic principle behind [N.J. Stat. Ann. § 2A:53A-41] is that the challenging expert who executes an affidavit of merit in a medical malpractice case, generally, should be equivalently-qualified to the defendant physician.") (emphasis added) (internal quotation marks and citation omitted); id. at 248 ("Under [N.J. Stat. Ann. § 2A:53A-41(a)], the first inquiry must be whether a physician is a specialist or general practitioner. If the physician is a specialist, then the second inquiry must be whether the treatment that is the basis of the malpractice action 'involves' the physician's specialty.") (emphasis added). But we cannot regard Buck as conclusive on the point, as the court's use of the word "physician" merely might reflect the identity of the parties in that case.

Inc., 623 F.3d 212, 216 (3d Cir. 2010). In making this prediction, we look to "'decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue,'" as well as to "'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" Id. at 216-17 (quoting Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008)).

Of course, in interpreting a statute, we first examine its text as the Supreme Court of New Jersey would do in any case of statutory interpretation.[24] DiProspero v. Penn, 874 A.2d 1039, 1049 (N.J. 2005) ("Our analysis . . . begins with the plain language of the statute.") (citing Miah v. Ahmed, 846 A.2d 1244, 1249 (N.J. 2004)). "If the language is plain and clearly reveals the statute's meaning, the Court's sole function is to enforce the statute according to its terms." Frugis v. Bracigliano, 827 A.2d 1040, 1058 (N.J. 2003). "If the statute suggests more than one interpretation, the broader legislative scheme, its history, and relevant sponsor statements may also inform the Court's interpretation in light of the statute's overall policy and purpose." Id. In interpreting a statute, the New

---

[24]We are not aware of any precedential opinions by the New Jersey Superior Court, Appellate Division, on whether N.J. Stat. Ann. § 2A:33A-41 applies to a physician assistant. In conformity with the practice of this Court, we will not refer to the Appellate Division's not precedential opinions dealing with the issue.

Jersey courts' "overriding goal must be to determine the Legislature's intent." Frugis, 827 A.2d at 1058 (quoting Cornblatt, P.A. v. Barow, 708 A.2d 401, 407 (N.J. 1998)); see also DiProspero, 874 A.2d at 1048 ("The Legislature's intent is the paramount goal when interpreting a statute.").

N.J. Stat. Ann. § 2A:53A-41(a) applies to Ms. Biedenbach only if she is "a specialist or subspecialist recognized by the [ABMS] or the [AOA] and the care or treatment at issue involves that specialty or subspecialty recognized by the [ABMS] or [AOA]." N.J. Stat. Ann. § 2A:53A-41.[25] The ABMS is made up of Member Boards, including the ABEM, which are responsible for "certify[ing] physicians." http://abms.org/who_we_help/physicians/specialties.aspx. Similarly, the AOA oversees Specialty Certifying Boards, which certify doctors of osteopathic medicine. http://www.osteopathic.org/inside-aoa/development/aoa-board-certification/Pages/default.aspx. Thus, it would seem that N.J. Stat. Ann. § 2A:53A-41(a) applies only to persons offering testimony against specialized or licensed physicians. In this vein, we reject Emergency Physician Associates' argument that N.J. Stat. Ann. § 2A:53A-41(a) applies because Ms. Biedenbach practices in emergency rooms and because "Ms. Biedenbach's care and treatment of [Laura] involved the ABMS recognized

_____

[25]Emergency Physician Associates does not contend that Ms. Biedenbach qualifies as a board-certified specialist in emergency medicine.

46

specialty of Emergency Medicine." Appellee's br. at 22.[26] It may be that Ms. Biedenbach practices emergency care as the general public understands that term, and it may be that the care she provided to Laura involved that practice; however, it cannot be said that Ms. Biedenbach is a specialist in emergency medicine as the ABMS or AOA define that field or that the treatment she rendered to Laura involved that recognized specialty because those entities define and recognize specialties applicable only to physicians.

Concededly, N.J. Stat. Ann. §§ 2A:53A-41 includes some text in tension with our reading of the statute. Paragraph 41(a)(2)(a) provides that an expert must be engaged in "the active clinical practice <u>of the same health care profession in which the defendant is licensed</u>," and paragraph 41(a)(2)(b) provides similarly that the expert must have participated in the "instruction of students . . . <u>in the same health care profession in which the defendant is licensed.</u>" (emphasis added). This language, of course, gives rise to the inference that the statute encompasses more than one type of health care profession. Nevertheless, these provisions apply only in the circumstance that the defendant is board-certified in a specialty that the ABMS or AOA recognizes, and as explained above, those

[26]Emergency Physician Associates appears to argue as well that because the training required to become a physician assistant is "almost the same at that obtained by physicians," appellee's br. at 21, N.J. Stat. Ann. § 2A:53A-41(a) applies. The level of training required to become a physician assistant is entirely irrelevant to whether those professionals are encompassed by N.J. Stat. Ann. § 2A:53A-41(a).

47

entities recognize specialties only for physicians.[27]

Considering the text of the statute as a whole, we conclude that N.J. Stat. Ann. § 2A:53A-41(a) applies only to physicians. We note that this conclusion is in line with the New Jersey Legislature's purpose in enacting the Access and Responsibility Act. In New Jersey State Bar Ass'n v. State, 888 A.2d 526, 535 (N.J. Super. Ct. Ch. Div. 2005), the Superior Court extensively recounted the legislative history of the Access and Responsibility Act, and described the purpose thusly: "The overarching concern that came out of the hearings [on the Act] and the problem the bill aimed to solve (as noted in the legislative purpose) . . . [was that] 'as a consequence of the cost of medical malpractice insurance, many physicians feel they cannot afford to practice medicine, and, therefore the medical services needed will not be available to [New Jersey's] citizens.'" (quoting August 2002 Hearing (comments of

---

[27]The ambiguous drafting of N.J. Stat. Ann. § 2A:53A-41 renders strict reliance on the text problematic. For example, paragraphs 41(a)(2)(a) and 41(a)(2)(b) also include language that reads "if the defendant is a specialist or subspecialist recognized by the [ABMS] or the [AOA]" the clinical practice or pedagogical experience must be in that recognized specialty or subspecialty. Again, paragraphs 41(a)(2)(a) and 41(a)(2)(b) apply only where the defendant is a board-certified specialist in a recognized specialty. A board-certified specialist is, obviously, a specialist recognized by the ABMS or AOA. Accordingly, the purpose of the "if" language of paragraphs 41(a)(2)(a) and 41(a)(2)(b) is not clear.

Assemblyman Edwards)) (emphasis added).  In this regard, the legislature sought to remedy the situation that the physicians being forced out were often specialists in obstetrics and gynecology, emergency medicine, and surgery, and that "physicians in other specialties report[ed] high double-digit premium increases and fewer companies willing to write coverage."   888 A.2d at 535 (emphasis added) (internal quotation marks and citation omitted); id. at 536 ("Of particular concern was the number of doctors, particularly obstetrician/gynecologists, who discontinued parts of their practice or retired altogether due to the inability to afford their liability coverage.") (emphasis added).  Accordingly, "[t]he goals of the final legislation were to 'reform the State's ailing medical malpractice insurance system to provide insurance relief for doctors and ensure that patients in New Jersey' will be able to get the treatment they seek."   Id. at 536 (quoting Press Release from offices of Senators Vitale and Lesniak (Mar. 22, 2004)).

As a physician assistant, Ms. Biedenbach thus is excluded from the criteria for testimony that N.J. Stat. Ann. § 2A:53A-41(a) specifies.  We express no opinion as to whether the expert statements that Lomando submitted are otherwise sufficient for the case against Emergency Physician Associates to proceed, and we remand the matter to the District Court so that it may determine the course of the case against that defendant.[28]

---

[28]Of course we do not express an opinion on whether the District Court should decline to exercise supplemental jurisdiction over the case against Emergency Physician Associates.  Assuming

## V.  CONCLUSION

For the foregoing reasons, we will affirm the order of March 18, 2011, in part, will reverse it in part, and will remand the case to the District Court for further proceedings but only against Emergency Physician Associates as we are affirming the summary judgments in favor of all other appellees.  Costs are allowed on this appeal in favor of all appellees other than Emergency Physician Associates against Lomando and in favor of Lomando against Emergency Physician Associates.

---

that it retains the case, the question for the Court will remain whether the standards applicable to experts offering testimony against a "general practitioner," N.J. Stat. Ann. § 2A:53A-41(b), apply to Ms. Biedenbach.  So far as we are aware, the New Jersey courts have not addressed this question with respect to a physician assistant.  We note, however, that N.J. Stat. Ann. § 2A:53A-41(b) does not reference the ABMS or AOA, and provides simply that if the defendant "is a general practitioner," the expert, during the year preceding the date of the alleged negligence, must have devoted a majority of his professional time to "active clinical practice as a general practitioner" or active clinical practice encompassing the condition or procedure that is the basis for the claim, or the instruction of students in a school, residency, or research program "in the same health care profession" as the defendant.  We do not offer our opinion on this point, which the parties have not addressed in their briefs.