CHAPMAN LAW FIRM, LPA, Plaintiff,

v.

UNITED STATES, Defendant.

No. 09–891C.

United States Court of Federal Claims.

Jan. 18, 2012.

---

James S. DelSordo, Argus Legal, LLC, Manassas, VA, for the plaintiff.

Lauren S. Moore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With her were Jeanne E. Davidson, Director, Commercial Litigation Branch, and Tony West, Assistant Attorney General. Of counsel,

Richard A. Marchese, Attorney, United States Department of Housing and Urban Development, Philadelphia, PA.

## OPINION

HORN, Judge.

## BACKGROUND AND FINDINGS OF FACT

Plaintiff, Chapman Law Firm, LPA (Chapman), filed a complaint in the United States Court of Federal Claims. In its complaint, Chapman alleges that the United States Department of Housing and Urban Development (HUD) wrongfully denied claims for reimbursement it had submitted pursuant to Contract No. C–PHI–00958 (the Contract). According to plaintiff, the costs were incurred as a result of pre-performance, stop work orders issued by the Contracting Officer, constructive and actual changes made by the government to the Contract, theft of trade secrets, and the government's bad faith failure to exercise Option Year 1 of the Contract. The plaintiff also requested attorneys' fees, interest, and any other and further relief deemed appropriate by the court.

The government ultimately submitted an amended Answer in which it filed counterclaims for violations of the False Claims Act, 31 U.S.C.A. § 3729 (2009), and asserted various affirmative defenses, including breach of contract, unclean hands, offset, failure to mitigate damages, and Special Plea in Fraud, 28 U.S.C. § 2514 (2006). Defendant seeks relief in an appropriate amount, a penalty for each violation of the False Claims Act, interest, and further appropriate relief.

The defendant filed a motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) on an issue of contract interpretation.[1] Defendant asserts that Chapman failed to employ Ohio-licensed inspectors while conducting diagnostic inspections for wood destroying organisms (WDO) in homes owned by HUD, in violation of certain Ohio state laws incorporated into the Contract. Defendant relies on four Contract provisions and four Ohio state laws in its motion for partial summary judgment: Contract Section 5.1.8, "Compliance with Legislative, Regulatory and Policy Requirements," Contract Section 5.3.3.2, "Inspections," Contract Section 5.3.9, "Termites and Wood Destroying Organisms," Contract Section 5.3.9.1, "Clearance," Ohio Administrative Code §§ 901:5–11–01 (2007) and 901:5–11–13 (2007), and Ohio Revised Code §§ 921.06 (2007) and 921.24 (2007).[2]

The case originated when HUD issued Request for Proposal (RFP) Number ROPC–22505. The RFP requested bids for the management and marketing of HUD single family homes. In particular, the RFP requested:

> Management & Marketing services to successfully monitor mortgagee compliance with the Department's property conveyance requirements, to successfully manage single family properties owned by, or in the custody of, the Department of Housing and Urban Development (HUD), to successfully market those single family properties which are owned by HUD, and to successfully oversee the sales closing activity, including proper accounting for HUD's sales proceeds.

HUD awarded Chapman the Contract for the management and marketing of single family homes in Ohio and Michigan.[3] Sec-

1. The record provided to the court by the parties was at times difficult to follow, even though the court requested the parties to re-file the appendices on several occasions to correct recurring defects. For example, attachments submitted to the court included illegible material, and, in some instances, it was impossible to discern which pages corresponded with which documents, as certain single documents in the appendix were divided and submitted as separate attachments. The parties also submitted their appendix as two distinct "Stipulations" in which appendix numbers VII through XIV were listed as appendices 1–8, and a significant number of pages referenced in the index to the appendix were listed as "blank" without explanation.

2. Although quoting the language of Ohio Revised Code § 921.24, plaintiff cited to Ohio Revised Code § 921.01 (2007).

3. In this opinion, the court does not consider the properties managed and marketed by Chapman in Michigan. Neither party briefed Michigan law nor discussed the Michigan properties in their pleadings.

tion 5.3.3.2 of the Contract, "Inspections," directed Chapman to "routinely inspect and take all actions necessary to preserve, protect and maintain each [HUD] property." As part of its inspection duties, Chapman was required to conduct up to two inspections on each home for termites and other wood destroying organisms, with subsequent optional inspections to be determined by general trade practices in the geographic region. Contract Section 5.3.9, "Termites and Wood Destroying Organisms," governed the initial, required inspection:

> Prior to listing, the Contractor shall obtain a termite and Wood Destroying Organisms (WDO) inspection on all properties located in FHA [Federal Housing Administration] designated Termite Probability Zones (TPZ), except vacant lots, properties identified for demolition or properties sold under an Asset Control Area Agreement. TPZ areas are listed by State at www.hud.gov/offices/hsg/sfh/ref/sfh1–23.cfm. The Contractor shall pay the cost of the WDO inspection and any subsequent inspections required in 5.3.9.1.

Contract Section 5.3.9.1, "Clearance," provided:

> For properties, which require a WDO inspection in 5.3.9, the Contractor shall provide a current termite/WDO clearance letter at closing if requested by the purchaser. In some areas this will require a reinspection no earlier than thirty (30) days prior to closing. Additionally, the Contractor may at its discretion and expense, provide WDO inspections and clearances in areas not required under 5.3.9 if the seller in that market generally provides such inspections and clearances.

Pursuant to Contract Section 5.1.8, "Compliance with Legislative, Regulatory and Policy Requirements," all of the Contract provisions, including Section 5.3.9 and Section 5.3.9.1, were to be carried out pursuant to applicable federal, state, and local laws:

> The Contractor shall comply with all Federal, state or local laws or regulations pertaining to the activities described in this PWS [Performance Work Statement]. When local laws and regulations conflict with HUD requirements, the Contractor

shall notify the GTR [Government Technical Representative] and the Contracting Officer.

Consequently, for the purposes of this opinion, Chapman's Contract incorporated applicable Ohio laws.

In its motion for partial summary judgment, defendant claims that plaintiff failed to comply with Section 5.1.8 of the Contract by using inspectors who were not licensed in Ohio to conduct inspections for wood destroying organisms in violation of Ohio law. The inspections were conducted in 2007 and 2008. The statutes for 2007 and 2008 for the above four Ohio laws are identical. Ohio Administrative Code § 901:5–11–01(N)(12) provided:

> "Wood-destroying insect diagnostic inspection" means the examination of a structure at the request of any **party involved in a contemplated real estate transaction** to determine if wood destroying insects are present in the structure, if there is evidence they either are or have been present in the structure, or the presence of any visible damage to the structure caused by wood-destroying insects and the generation of a written report of the findings of the examination.

Ohio Admin. Code § 901:5–11–01(N)(12) (emphasis added).

Although not cited to the court by the defendant, in the definitions section of the Ohio Revised Code, "commercial applicator" is defined as, "an individual who is licensed under section 921.06 of the Revised Code to apply pesticides or to conduct authorized diagnostic inspections." Ohio Rev.Code § 921.01(F). An authorized diagnostic inspection is defined as, "a diagnostic inspection conducted by a commercial applicator in the pesticide-use category in which the commercial applicator is licensed under this chapter." Ohio Rev.Code § 921.01(K). Other relevant Ohio state laws indicate that, "authorized" diagnostic inspections must be carried out by inspectors licensed in Ohio. Ohio Revised Code § 921.06 states that a person "[c]onduct[ing] authorized diagnostic inspections" is required to have a commercial

applicator license.[4] Ohio Rev.Code § 921.06(A)(1)(e). Ohio Administrative Code § 901:5–11–13 provides that "[c]ommercial applicators conducting wood-destroying insect diagnostic inspections [hereinafter inspections] ... Shall conduct all inspections in accordance with the practices set forth in the Ohio wood-destroying insect diagnostic inspection training program." Ohio Admin. Code § 901:5–11–13. Ohio Revised Code § 921.24 provides that "No person shall do any of the following ... (B) Act as a commercial applicator without being licensed to do so ... (I) Make false or fraudulent records, invoices, or reports ... (O) Aid or abet a licensee or another person in violating this chapter or rules adopted thereunder; (P) Make a false or misleading statement in an inspection concerning any infestation of pests or the use of pesticides ... (U) Engage in fraudulent business practices...." Ohio Rev. Code § 921.24.

Defendant argues that the Contract directed the inspections under Section 5.3.9 to be conducted in accordance with the requirements of Ohio law and that under Ohio Administrative Code § 901:5–11–01(N)(12), HUD was a "party involved in a contemplated real estate transaction," "i.e., the eventual sale of the property," and, therefore, plaintiff was required to use licensed commercial inspectors to conduct the WDO inspections. Plaintiff responds that it:

> conducted more than one termite inspection: (1) when each properly [sic] was initially received by CLF [Chapman Law Firm] into its inventory from HUD; (2) during CLF's bi-monthly health and safety inspections; and (3) when the property was analyzed by an appraiser. Because none of these inspections was [sic] requested by 'any party involved in a contemplated real estate transaction' they were not

WDO inspections as described under Ohio law. Therefore, CLF did not have to employ licensed inspectors to perform these inspections.

Plaintiff also asserts that "because these inspections were not required by Ohio law the inspections conducted in accordance with § 5.3.9 of the Contract they [sic] were not listed on CLF's electronic management system ('EMS') which described CLF's work on each property for HUD's information.... Information on these inspections was not provided on CLF's marketing website available to the public." (internal citation omitted).

The parties have stipulated that the individuals plaintiff employed to perform inspections on the HUD homes that were managed and marketed by Chapman were not Ohio-licensed WDO inspectors, nor had any of them ever been a licensed WDO inspector in Ohio. According to the joint statement of facts, Chapman's employees completed a National Pest Management Association (NPMA)–33 form for each inspection. It appears from the record that, initially, Chapman posted the forms on its website, but, as is discussed below, when directed by an Ohio official, Chapman removed the forms from its website.[5]

Following an anonymous phone call which alleged that Chapman was improperly completing the NPMA–33 forms, an official from the Ohio Department of Agriculture visited Chapman. Specifically, the "caller stated that the firm places their WDI [wood destroying insect] inspection forms (NPMA–33) on their website and they are not completed properly. In addition, the anonymous caller stated that the firm performs a high number of inspections per day which would appear to be physically impossible." Members of Chapman, including the president, the chief

---

4. The parties have not presented, and the court has not identified, an Ohio statute which states specifically that a "wood-destroying insect diagnostic inspection" is an "authorized diagnostic inspection," which requires licensure. The parties jointly have stipulated that "[t]he forms represented that WDO inspections were performed pursuant to the contract."

5. The joint stipulation of facts does not appear to conform to the statement in plaintiff's opposition to defendant's motion for partial summary judg-

ment. In the opposition, plaintiff states that information on its WDO inspections was not posted on its website (citing a statement of Mr. Chapman in the joint appendix), but in the joint stipulation of facts plaintiff agrees that the Ohio official concluded that Mr. Chapman signed a letter stating that the NPMA forms would be removed from their website. The joint appendix also includes both the statement by Mr. Chapman and his letter.

legal counsel and executive and marketing vice president, the vice president of operations, and a customer service representative, were interviewed by Ohio Department of Agriculture personnel. Plaintiff explained to the Ohio official:

Inspectors perform an initial inspection on a property and can inspect a home every six months or so depending upon when the property is sold. The inspection performed is a general inspection per HUD requirements [that] is not specifically a WDI inspection.... The representatives stated that to date of the inspection they have not performed a WDI inspection for a real estate transaction. They further explained that the firm thought that they were providing a service to potential buyers by placing the NPMA–33 form on their website.

The Ohio official's report on the matter provided a summary, which stated:

- Chapman Law Firm and Real Estate has six commercial applicators that are solely licensed in category 12. According to the firm the inspectors have territories in Ohio that they are responsible for.

- Chapman Law Firm and Real Estate was placing forms for WDI [6] inspections, (NPMA–33) on their web site for properties that were not completed per ODA laws and regulations.

- Chapman Law Firm was placing the forms on the site as a service to potential buyers.

- The WDI forms were generated from the inspector's PDA as a result of the firm's non WDI inspection checklist; therefore it appears that every property has received a WDI inspection.

- **Chapman Law Firm has not conducted a WDI inspection for a real estate transaction.**

- **Chapman Law Firm was informed to remove the NPMA–33 forms from their website.**

- Chapman Law Firm *has* removed the NPMA–33 form from their website.

(italics in original; emphasis added).

The full "Findings and Observations" of the Ohio official were as follows:

An anonymous call was placed to Reynoldsburg stating that Chapman Law Firm and Real Estate is new to performing WDI inspections. The anonymous caller stated that the firm places their WDI inspection forms (NPMA–33) on their website and they are not completed properly. In addition the anonymous caller stated that the firm performs a high number of inspections per day which would appear to be physically impossible.

Chapman Law Firm and Real Estate was inspected on December 11, 2007. Chapman Law Firm and Real Estate provides service in areas of real estate law and the management and marketing of real estate owned properties. The firm serves branches of the Department of Housing and Urban Development (HUD), the Department of Agriculture and the Department of the Interior.

Initially, Whitney Dutton, customer service representative was interviewed. Dutton was unable to provide certain information therefore he obtained other company representatives for the inspection. Dutton did state that the inspectors were not at the site at the time of inspection because the [sic] primarily work out of their home.

Frank H. Chapman II, attorney at law and president, Justin M. Smith, chief legal counsel and executive & marketing vice president and John Goss, vice president of operations were interviewed. The company officials explained the firms [sic] WDI inspection procedure as follows:

- Inspectors perform an initial inspection on a property and can inspect a home every six months or so depending upon when the property is sold.

- The inspection performed is a general inspection per HUD requirements and is not specifically a WDI inspection.

---

**6.** The Ohio report refers to WDI inspections. The Ohio statute describes "wood-destroying insect diagnostic inspection[s,]" Ohio Administra- tive Code § 901:5–11–01(N)(2), and Contract Section 5.3.9 uses the term "Wood Destroying Organisms (WDO) inspection."

• The inspectors utilize a PDA to complete HUD inspection forms. When the inspector completes the form on the PDA, the PDA automatically completes a WDI. [sic] NPMA–33 form. The inspection information is electronically sent to the firm's office and it is placed on the firm's web site.

The firm's representatives were asked if the inspectors are performing a WDI inspection per the departments [sic] laws and regulations, i.e., for a real estate transaction. The representatives stated that to date of the inspection they have not performed a WDI inspection for a real estate transaction. They further explained that the firm thought that they were providing a service to potential buyers by placing the NPMA–33 form on the their website.

Representatives were informed that if the inspectors have not performed a WDI inspection then a NPMA–33 form can not be used or provided on the firm's web site. Chapman stated that the NPMA–33 forms would be removed from the firm's web site by the end of the day.. Chapman further stated that the form would only be used if a WDI inspection was performed per ODA's laws and regulations. Chapman provided a statement.

The Ohio official's report, therefore, concluded that Chapman had not erred in conducting certain inspections for wood destroying organisms using unlicensed inspectors, although Chapman was informed that it should not post NPMA–33 forms on its website when the inspections conducted were not WDI inspections under Ohio law.

Chapman states that shortly after it received the Ohio official's report, the government "announced . . . that it did not intend to exercise Option Year 1 of the Contract," despite previously informing Chapman that it would do so, as a result of which the Contract terminated by its terms. According to Chapman, it subsequently sought a contracting officer's final decision regarding requests for an equitable adjustment for costs incurred due to the government's pre-performance, stop work orders, Contract changes, and allegations of bad faith. The Contracting Officer denied Chapman's stop work order claim related to the pre-performance delays, but failed to issue a final decision on Chapman's other claims, which Chapman asserts were deemed denied. Thereafter, Chapman filed its complaint in this court.

## DISCUSSION

RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar, both in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (2011); Fed.R.Civ.P. 56(a) (2011); *see also Alabama v. North Carolina*, —— U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed. Cir. 2010); *Consol. Coal Co. v. United States*, 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States*, 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1378 (Fed.Cir. 2009); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied*, 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States*, 404 F.3d 1335, 1342 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2005); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1370–71 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir. 2004), *cert. denied*, 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Cohen v. United States*, 100 Fed.Cl. 461, 469 (2011); *Boensel v. United States*, 99 Fed.Cl. 607, 610 (2011). A fact is material if it will make a difference in the result of a case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Thomp-*

son v. United States, 101 Fed.Cl. 416, 425–26 (2011); Cohen v. United States, 100 Fed.Cl. 461, 469 (2011). Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–48, 106 S.Ct. 2505; see also Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed.Cir.2001); Walker v. United States, 79 Fed.Cl. 685, 692 (2008); Curtis v. United States, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), cert. denied, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), reh'g denied, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

■■■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249, 106 S.Ct. 2505; see, e.g., Schlup v. Delo, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Cohen v. United States, 100 Fed.Cl. at 469–70; Boensel v. United States, 99 Fed.Cl. at 611 (2011); Macy Elevator, Inc. v. United States, 97 Fed.Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed.Cl. 113, 126 (2009); Johnson v. United States, 49 Fed.Cl. 648, 651 (2001), aff'd, 52 Fed.Appx. 507 (Fed. Cir.2002), published at 317 F.3d 1331 (Fed. Cir.2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250–52, 106 S.Ct. 2505; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed.Cir), reh'g denied and en banc suggestion declined (Fed.Cir. 1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed.Cir.2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

In appropriate cases, summary judgment:

saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl.Ct. 606, 614–15 (1991) (quoting Pure Gold, Inc. v. Syntex, Inc., 739 F.2d 624, 626 (Fed.Cir.1984), vacated on other grounds, 970 F.2d 890 (Fed.Cir. 1992)) (citation omitted); see also Metric Constr. Co., Inc. v. United States, 73 Fed.Cl. 611, 612 (2006).

■■■ Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S.Ct. 2505; see also Takeda Pharm. Co. v. Doll, 561 F.3d 1372, 1375 (Fed.Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed.Cir.), reh'g and reh'g en banc denied (Fed.Cir. 2007), cert. denied, 555 U.S. 812, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed.Cir.1999); Gonzales–McCaulley Inv. Group, Inc. v. United States, 101 Fed.Cl. 623, 628–29 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party

opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Yant v. United States,* 588 F.3d 1369, 1371 (Fed.Cir.2009), *cert. denied,* —— U.S. ——, 131 S.Ct. 69, 178 L.Ed.2d 23 (2010); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.,* 272 F.3d 1365, 1369 (Fed.Cir.2001), *reh'g and reh'g en banc denied,* 293 F.3d 1364 (Fed.Cir. 2002), *cert. denied,* 539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanless v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1998); *see also Am. Pelagic Co. v. United States,* 379 F.3d at 1371 (citing *Helifix Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, 1345–46 (Fed.Cir.2000)); *Boensel v. United States,* 99 Fed.Cl. at 611 (" 'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' " (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587– 88, 106 S.Ct. 1348; *Casitas Mun. Water Dist. v. United States,* 543 F.3d at 1283, *Lathan Co. Inc. v. United States,* 20 Cl.Ct. 122, 125 (1990))). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B. v. United States,* 584 F.3d 1369, 1374 (Fed.Cir.2009); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505.

■ The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Riley & Ephriam Constr. Co. v. United States,* 408 F.3d 1369, 1371 (Fed.Cir.2005); *Crown Operations Int'l Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1377 (Fed.Cir.), *reh'g denied* (Fed.Cir.

2002); *Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.,* 109 F.3d 739, 741 (Fed. Cir.1997) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1995)), *reh'g denied* and en banc *suggestion declined* (Fed.Cir. 1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997); *Dana R. Hodges Trust v. United States,* 101 Fed.Cl. 549, 553–54 (2011). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *see also Wavetronix LLC v. EIS Elec. Integrated Sys.,* 573 F.3d 1343, 1354 (Fed. Cir.2009); *Long Island Sav. Bank, FSB v. United States,* 503 F.3d at 1244; *Florida Power & Light Co. v. United States,* 375 F.3d 1119, 1124 (Fed.Cir.2004); *Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001); *Am. Airlines, Inc. v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States,* 434 F.3d 1359, 1369 (Fed.Cir.2006).

■ Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Marriott Int'l Resorts, L.P. v. United States,* 586 F.3d 962, 968–69 (Fed.Cir.2009); *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert.*

*denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001); *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *Rogers v. United States,* 90 Fed.Cl. 418, 427 (2009); *Consol. Coal Co. v. United States,* 86 Fed.Cl. 384, 387 (2009), *aff'd,* 615 F.3d 1378 (Fed.Cir.2010); *St. Christopher Assocs., L.P. v. United States,* 75 Fed.Cl. 1, 8 (2006), *aff'd,* 511 F.3d 1376 (Fed. Cir.2008); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or otherwise stated, in favor of the non-moving party. *See First Commerce Corp. v. United States,* 335 F.3d 1373, 1379 (2003); *see also DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed. Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *Oswalt v. United States,* 85 Fed.Cl. 153, 158 (2008); *Telenor Satellite Servs., Inc. v. United States,* 71 Fed.Cl. 114, 119 (2006). "Questions of law are particularly appropriate for summary judgment." *Oenga v. United States,* 91 Fed.Cl. 629, 634 (2010) (citing *Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.1999) ("Summary judgment was appropriate here [in *Dana Corp.*] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")).

In its motion, defendant requests "the Court to grant partial summary judgment in the Government's favor upon the grounds that the plain language of the parties' contract and Ohio State law, along with the undisputed facts set forth in our joint stipula-tion of facts, demonstrate that plaintiff, Chapman Law Firm ('CLF'), failed to comply with the contract's requirement that it employ licensed inspectors to conduct WDO inspections for the subject properties." According to the defendant, "the contract, read together with Ohio law, required CLF to employ inspectors with Ohio licenses to conduct WDO inspections for the properties in the contract." Although Chapman agrees that it did not use Ohio-licensed inspectors to perform the initial WDO inspections, it asserts that the initial inspections were not requested by a "party involved in a contemplated real estate transaction" under Ohio Administrative Code § 901:5–11–01. Chapman contends that the Contract "envisions two different types of inspections for the presence of termites (called wood destroying organisms ['WDO'] ) one which occurs before a house is listed for sale by the M & M [Management and Marketing] Contractor (Contract § 5.3.9) and one which occurs if a purchaser of the property requests an inspection (Contract § 5.3.9.1)." Chapman interprets the term "party involved in a contemplated real estate transaction" to refer to an impending sale of real property in which both a buyer and seller for that property exist and are identifiable. Chapman argues that the initial inspections, "which occur[ ] before a house is listed for sale," cannot possibly form part of a "contemplated real estate transaction" because there is yet no purchaser for the property. Chapman asserts that the inspections required under Contract Section 5.3.9 were not "[w]ood-destroying insect diagnostic inspections" within the meaning of Ohio Administrative Code § 901:5–11–01 because they were not requested by a purchaser. Therefore, according to Chapman, it did not have to use Ohio-licensed inspectors for the initial inspections.

Defendant responds that Chapman's "interpretation of the contract is meritless." According to defendant, the Contract did not envision two types of inspections. Rather, defendant asserts, both the pre-listing and routine home inspections had to be performed by Ohio-licensed contractors because all of the inspections had to be conducted pursuant to state law. Under Ohio Revised

Code § 921.06, a person "[c]onduct[ing] authorized diagnostic inspections" must have an Ohio license. Although not citing to the definitions section of the Ohio statute in its briefs, defendant appears to suggest that any wood destroying insect diagnostic inspection defined under Ohio Administrative Code § 901:5–11–01 is an "authorized diagnostic inspection," [7] which requires licensed inspectors. According to defendant, under Ohio Administrative Code § 901:5–11–01, HUD was a "party involved with a contemplated real estate transaction, *i.e.*, the eventual sale of the property," and it was HUD that requested the initial inspection from Chapman. Defendant asserts that only a buyer or a seller was necessary for there to be a party involved in a contemplated real estate transaction, which required Chapman to use Ohio-licensed inspectors for all inspections.

Resolution of defendant's motion for partial summary judgment, therefore, requires the court to interpret words incorporated into the Contract between the parties by Contract Section 5.1.8, specifically the phrase: "party involved in a contemplated real estate transaction" in Ohio Administrative Code § 901:5–11–01(N)(12), so as to determine whether all WDO inspections mandated by the Contract were required to be conducted by Ohio-licensed inspectors.

▮▮▮▮ Contract interpretation starts with analysis of the language of the written agreement. *See Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993). The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

*Jowett Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000) (quoting *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435, *reh'g denied and en banc suggestion declined* (Fed.Cir. 1996), and *Harris v. Dep't of Veterans Affairs,* 142 F.3d 1463, 1467 (Fed.Cir. 1998)); *see also McHugh v. DLT Solutions, Inc.,* 618 F.3d 1375, 1380 (Fed.Cir.2010); *Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances."); *Marquardt Co. v. United States,* 101 Fed.Cl. 265, 268 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)); *Enron Fed. Solutions, Inc. v. United States,* 80 Fed.Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving thereof."). " ' "In contract interpretation, the plain and unambiguous meaning of a written agreement controls." The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.' " *Arko Exec. Servs., Inc. v. United States,* 553 F.3d at 1379 (quoting *Hercules Inc. v. United States,* 292 F.3d 1378, 1380–81 (Fed.Cir.), *reh'g and reh'g en banc denied*

**7.** As noted above, the Ohio statute does not specifically define a "wood-destroying insect diagnostic inspection" as an "authorized diagnostic inspection" that requires licensure, although "wood-destroying insect diagnostic inspection" is defined by Ohio Administrative Code § 901:5–11–01(N)(2), Ohio Administrative Code § 901:5–11–13(A) refers to a wood destroying insect diagnostic inspection training program, and Ohio Administrative Code §§ 901:5–11–07(C) (2007) and 901:5–11–08(A)(4) (2007) refer to businesses and persons who are licensed to conduct wood destroying insect diagnostic inspections.

(Fed.Cir. 2002) (quoting *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed.Cir.1991))); *see also Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed.Cir.2006) (citations omitted); *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed.Cir.2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted).

■■■ " '[I]t has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation.' " *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988) (quoting *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct.Cl.1971)); *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed.Cir.1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); *see also Flexfab, LLC v. United States*, 424 F.3d 1254, 1262 (Fed.Cir.2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer...."). When the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. *See Teg–Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed.Cir.2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions." (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed.Cir.2003))); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 824 (Fed.Cir.2010), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied,* —— U.S. ——, 131 S.Ct. 997, 178 L.Ed.2d 826 (2011); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed.

Cir.2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *King v. Dep't of Navy*, 130 F.3d 1031, 1033 (Fed.Cir. 1997) ("If ambiguity is found, or if ambiguity has arisen during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made."); *Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). "Generally, the plain language of a contract controls; however, language that is reasonably susceptible to more than one interpretation, where 'each [interpretation] ... is found to be consistent with the contract language,' may be considered ambiguous." *Marquardt Co. v. United States*, 101 Fed.Cl. at 268 (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993)). Because an ambiguous or uncertain writing sometimes only can be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous contract clause. *See Cruz–Martinez v. Dep't of Homeland Sec.*, 410 F.3d 1366, 1371 (Fed.Cir.2005) (" '[M]eaning can almost never be plain except in a context.' " (quoting *Restatement (Second) of Contracts* § 212, cmt. b (1981))); *Barron Bancshares, Inc. v. United States*, 366 F.3d at 1375 (holding that extrinsic evidence is permissible to interpret an ambiguous contract); *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003).

■■■ In this case, the court first must ascertain whether the language at issue is ambiguous. *See NVT Tech., Inc. v. United States*, 54 Fed.Cl. 330, 335 (2002) (finding that the threshold question is whether the document in question contains ambiguous language), *aff'd,* 370 F.3d 1153 (Fed.Cir. 2004). The United States Court of Appeals for the Federal Circuit has stated that, "[t]o show an ambiguity [in contract language,] it is not enough that the parties differ in their respective interpretations of a contract term." *NVT Tech., Inc. v. United States,*

370 F.3d 1153, 1159 (Fed.Cir.2004). In order to demonstrate ambiguity, the interpretations offered by both parties must "'fall within a "zone of reasonableness".'" *Id.* (quoting *Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999) (citations omitted)); *see also Ace Constructors, Inc. v. United States,* 499 F.3d 1357, 1361 (Fed.Cir. 2007) ("[I]n interpreting a solicitation, '[it] is ambiguous only if its language is susceptible to more than one reasonable interpretation.... If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.'" (quoting *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 (Fed.Cir. 2004))). The Federal Circuit has stated that "[a] 'patent ambiguity' is one that is 'obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start,'" and "'a patent ambiguity does not exist where the ambiguity is neither glaring nor substantial nor patently obvious.'" *States Roofing Corp. v. Winter,* 587 F.3d 1364, 1372 (Fed. Cir.2009) (citations omitted); *see also LAI Servs., Inc. v. Gates,* 573 F.3d 1306, 1315–16 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2009); *NVT Tech., Inc. v. United States,* 370 F.3d at 1162 ("If the ambiguity is patent, it triggers a duty to inquire."); *Linc Gov't Servs., LLC v. United States,* 96 Fed.Cl. 672, 708–09 (2010). The Federal Circuit also has indicated that "a proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract." *H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir.1998).

 If there is a latent ambiguity in the interpretation of a contract, the doctrine of *contra proferentem* applies. According to the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision .... the provision should be construed less favorably to that party which selected the contractual language." *United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224, *reh'g denied,* 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed.2d 546 (1970). This doctrine of *contra proferentem* "'pushes the drafters toward improving contractual forms and it saves contractors from hidden traps not of their own making.'" *Fry Commc'ns, Inc. v. United States,* 22 Cl.Ct. 497, 503 (1991) (quoting *Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970) (alteration in *Fry Commc'ns, Inc. v. United States* )).

The United States Court of Appeals for the Federal Circuit similarly has stated:

> When a dispute arises as to the interpretation of a contract and the contractor's interpretation is reasonable, we apply the rule of *contra proferentem,* which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document.

*Turner Constr. Co. v. United States,* 367 F.3d 1319, 1321 (Fed.Cir.2004) (citing *United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir.1987)); *see also Gardiner, Kamya & Assocs. v. Jackson,* 467 F.3d at 1352; *HPI/GSA–3C, LLC v. Perry,* 364 F.3d 1327, 1334 (Fed.Cir.2004).

In order to decide how to apply the doctrine of *contra proferentem,* after a court finds contract terms to be ambiguous and "susceptible to more than one reasonable interpretation," the court must first determine whether the ambiguity is latent or patent. *E.L. Hamm & Assocs., Inc. v. England,* 379 F.3d 1334, 1341, 1342 (Fed.Cir.2004) ("If an ambiguity exists, the next question is whether that ambiguity is patent."). In *States Roofing,* the Federal Circuit stated:

> A "patent ambiguity" is one that is "obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start." *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 499 F.2d 660, 671 (1974). As explained in *Grumman Data Systems Corp. v. Dalton,* "a patent ambiguity does not exist where the ambiguity is neither glaring nor substantial nor patently obvious." 88 F.3d 990, 997 (Fed.Cir. 1996) (internal quotation marks omitted). *See generally WPC Enters. [Inc. v. United States],* [163 Ct.Cl. 1,] 323 F.2d [874,] 877 [ (1963) ] ("Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omis-

sion, or a drastic conflict in provisions, he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation.").

. . .

 As precedent explains, there must be a glaring conflict or obvious error in order to impose the consequences of misunderstanding on the contractor. *See HPI/GSA 3C, LLC v. Perry,* 364 F.3d 1327, 1334 (Fed.Cir.2004) ("Where an ambiguity is not sufficiently glaring to trigger the patent ambiguity exception, it is deemed latent and the general rule of *contra proferentem* applies."); *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 973 (1965) ("[Contractors] are not expected to exercise clairvoyance in spotting hidden ambiguities in the bid documents, and they are protected if they innocently construe in their own favor an ambiguity equally susceptible to another construction, for . . . the basic precept is that ambiguities in contracts drawn by the Government are construed against the drafter.").

*States Roofing Corp. v. Winter,* 587 F.3d at 1372 (brackets and omissions in original); *LAI Servs., Inc. v. Gates,* 573 F.3d at 1315–16; *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751. "A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" *NVT Tech., Inc. v. United States,* 370 F.3d at 1162 (quoting *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 499 F.2d 660, 671 (1974)). "If an ambiguity is obvious [patent] and a bidder fails to inquire with regard to the provision, his interpretation will fail." *NVT Tech., Inc. v. United States,* 370 F.3d at 1162 (citing *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed. Cir.1997), *reh'g denied* (Fed.Cir. 1998)). "A contractor may not recover for a patent ambiguity." *E.L. Hamm & Assocs., Inc. v. England,* 379 F.3d at 1342. "The doctrine of patent ambiguity is an exception to the general rule of *contra proferentem,* which the courts use to construe ambiguities against the drafter." *Id.* (citing *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751) (emphasis in original).

 If, on the other hand, the ambiguity is latent or not obvious, the general rule of *contra proferentem* controls. *See HPI/GSA–3C, LLC v. Perry,* 364 F.3d at 1334. The doctrine of *contra proferentem* places the risk of latent ambiguity, lack of clarity, or absence of proper warning on the drafting party. However, it is "a 'rule of last resort' that 'is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved.'" *Gardiner, Kamya & Assocs., P.C. v. Jackson,* 467 F.3d at 1352 (quoting *Lewis v. United States,* No. 34–78, 29 C.C.F. ¶ 82,470, at *7, 1982 WL 36670, at *7 (Ct.Cl. Trial Div. Jan. 1, 1982) (decision adopted as the judgment of the United States Court of Claims, at 231 Ct.Cl. 799, 800 (1982))). In government contract cases, when the government drafts or selects the contract language this principle is accorded "considerable emphasis" because of the government's resources and stronger bargaining position in contract negotiations. *See generally United States v. Seckinger,* 397 U.S. at 216, 90 S.Ct. 880.

The contract language at issue in this case, a "party involved in a contemplated real estate transaction," found in Ohio Administrative Code § 901:5–11–01(N)(12), was incorporated into the Contract between plaintiff and HUD by Section 5.1.8. As to a strict definition of what constitutes a "party involved in a contemplated real estate transaction," Ohio law is silent. The pertinent phrase is not explained in Ohio statutes or regulations, has not been defined by an Ohio state trial or appellate court, and has not been addressed in prior decisions issued by the United States Court of Appeals for the Federal Circuit or this court. Therefore, an assessment of the ordinary meaning of the words at issue at the time the Contract was written must be undertaken, starting with the plain meaning of the term "party." Black's Law Dictionary 1153 (8th ed. 2004), defines "party" as "[o]ne who takes part in a transaction <a party to the contract.>" Merriam–Webster's Collegiate Dictionary 903 (11th ed. 2003) defines "party" as "a person or group taking one side

of a question, dispute, or contest." Just as courts "look to dictionary definitions published at the time that the statute was enacted" in construing statutory language, *Resource Conservation Grp., LLC v. United States,* 597 F.3d 1238, 1243 (Fed.Cir.2010) (footnote omitted), the court looks to dictionary definitions published at the time that the Contract was written in interpreting the contract language.

Regarding the phrase "contemplated real estate transaction," the court must assemble the meaning of the phrase by a study of its parts, since the phrase as a whole is not defined. "Real estate" concerns "property in buildings and land." Merriam–Webster's Collegiate Dictionary 1036. Black's Law Dictionary defines "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land. Real property can be either corporeal (soil and buildings) or incorporeal (easements)." Black's Law Dictionary 1254. "Transaction" is defined as "an exchange or transfer of goods, services, or funds ... a communicative action or activity involving two parties or things that reciprocally affect or influence each other," Merriam–Webster's Collegiate Dictionary 1327, and as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract ... Something performed or carried out; a business agreement or exchange ... Any activity involving two or more persons." Black's Law Dictionary 1535. Combining the definitions of transaction and real estate, it appears that a "real estate transaction" is an exchange, transfer, or other business dealing, carried out by two or more parties, involving buildings and/or land.

The term "contemplated" in the phrase "contemplated real estate transaction" is prefatory, modifying and giving purpose to the term "real estate transaction." The term "contemplated" means "to view or consider with continued attention: meditate on ... to view as contingent or probable or as an end or intention." Merriam–Webster's Collegiate Dictionary 269. As such, a "contemplated real estate transaction" is an exchange,

transfer, or other business dealing to be carried out between two or more parties involving buildings and/or land that is under consideration or is considered to be a probability or goal. In short, it means there is consideration of whether or not to enter into a business arrangement involving two or more parties and real property.

Defendant contends that if HUD alone, as the potential seller, was considering "the eventual sale of the property," the definition of "party involved in a contemplated real estate transaction" was met. From defendant's viewpoint, HUD was a potential seller that was considering a business arrangement, albeit with an unknown buyer, for the future sale of a HUD-owned home; as such, according to defendant, it was a "party involved in a contemplated real estate transaction," within the meaning of Ohio Administrative Code § 901:5–11–01, and plaintiff was required to conduct a licensed WDI inspection. Chapman maintains that both a seller and a buyer must exist for there to be a "party involved in a contemplated real estate transaction." From plaintiff's point of view there was no party involved in a contemplated real estate transaction until a potential buyer was identified and there were two parties, a buyer and seller, contemplating the sale and purchase of the HUD-owned home. Both interpretations have a reasonable basis.

 The court, therefore, concludes that the phrase "party involved in a contemplated real estate transaction" as used by Ohio Administrative Code § 901:5–11–01, and as applied to Contract Section 5.3.9 of the contract between the parties, is ambiguous because the interpretations offered by both parties " 'fall within a "zone of reasonableness." ' " *See NVT Tech., Inc. v. United States,* 370 F.3d at 1159 (quoting *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751 (citations omitted)). Furthermore, the ambiguity is latent and not patently " 'obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start.' " *States Roofing Corp. v. Winter,* 587 F.3d at 1372 (citation omitted). "[P]lac[ing] itself into the shoes of a reasonable and prudent contractor and decid[ing] how such a contractor would act in interpreting the contract," *H.B. Mac,*

*Inc. v. United States*, 153 F.3d at 1345, Chapman's interpretation, that for there to be a "real estate transaction," even a "contemplated" one, there must be two identified parties, a seller and a buyer, is reasonable. Although the word "contemplated" in the phrase admittedly creates some confusion, the choice of the term "transaction" and the dictionary definitions of that term support plaintiff's interpretation.

 HUD drafted and selected the contractual language, which incorporated Ohio Administrative Code § 901:5–11–01 as written. The doctrine of *contra proferentem* favors accepting plaintiff's interpretation of the disputed, ambiguous phrase, "party involved in a contemplated real estate transaction," and the court construes the disputed provision "less favorably" to defendant. *United States v. Seckinger*, 397 U.S. at 216, 90 S.Ct. 880. The court, therefore, finds that when conducting the WDO inspections prior to listing the properties to prepare the properties for sale, and prior to identification of a buyer, Chapman was in compliance with its duties of performance under the terms of the Ohio state law as incorporated into the Contract between the parties. Moreover, the Ohio Department of Agriculture inspector, interpreting and implementing the state statute found that plaintiff had not violated the Ohio Revised Code when it did not use Ohio licensed inspectors. The only violation the state inspector found was incorrect posting of the NPMA–33 forms online, which plaintiff corrected.

Defendant, however, argues that the report issued by the Ohio Department of Agriculture demonstrates that Chapman failed to comply with the Ohio law. According to defendant:

> In a summary of the December 11, 2007 visit, the official concluded that, among other things, "Chapman Law Firm and Real Estate was placing forms for WDI inspections, (NPMA–33) on their web site for properties that were not completed per [Ohio Department of Agriculture] laws and regulations." App. 140. By letter dated December 11, 2007, CLF [Chapman Law Firm] informed the Ohio Department of Agriculture that "[t]he Chapman Law

Firm has not performed any Wood Destroying Inspections for a real estate transaction within the meaning of Ohio law." App. 149. Also by letter dated December 11, 2007 and signed by Frank H. Chapman II, CLF further stated that, "[t]o clarify this point [regarding the alleged qualifications of CLF's inspectors], the termite inspections using [a Ohio National Pest Management Association form] posted on our public website will be removed by the close of business today." *Id.* Both CLF and [sic] Ohio Department of Agriculture, therefore, determined that CLF was using inspectors who were not licensed in Ohio to conduct WDO inspections under the contract, in violation of the contract's requirements.

Defendant misconstrues the Ohio Department of Agriculture's report. While the Ohio Department of Agriculture official did conclude that "Chapman Law Firm and Real Estate was placing forms for WDI inspections, (NPMA–33) on their web site for properties that were not completed per ODA laws and regulations," the Ohio report also concluded that "Chapman Law Firm has not conducted a WDI inspection for a real estate transaction." In the "Findings and Observations" section, the report states that representatives for Chapman explained to the Ohio Department official that "[i]nspectors perform an initial inspection on a property . . . per HUD requirements and [the inspection] is not specifically a WDI inspection." Chapman representatives were informed that if the inspectors have not performed a WDI inspection then a NPMA–33 form should not be used or provided on the firm's website. The Ohio report concluded:

- Chapman Law Firm and Real Estate has six commercial applicators that are solely licensed in category 12. According to the firm the inspectors have territories in Ohio that they are responsible for.

 . . .

- The WDI forms were generated from the inspector's PDA as a result of the firm's non WDI inspection checklist; therefore it appears that every property has received a WDI inspection.

- Chapman Law Firm has not conducted a WDI inspection for a real estate transaction.
- Chapman Law Firm was informed to remove the NPMA–33 forms from their website.
- Chapman Law Firm *has* removed the NPMA–33 form from their website.

(italics in original). The Ohio Department of Agriculture was aware that plaintiff was performing certain inspections without Ohio-licensed inspectors and concluded that plaintiff was not required to employ Ohio-licensed inspectors for those inspections.

 According to the United States Supreme Court, when:

the underlying substantive rule involved is based on state law ... the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving "proper regard" to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court.

*Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (citing *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956)) (discussing an underlying state law issue on an application of a federal statute). " 'When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule.' " *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1359 (Fed.Cir. 2005) (quoting *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir.2002), *reh'g and reh'g en banc denied* (Fed.Cir. 2006) (citations omitted)); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 165 (Fed.Cir. 1985) ("Where, as in this case, there is no decision by the Supreme Court of Washington or by any other court of that state ... we must decide whether the district court properly predicted the applicable Washington law." (citing *Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. at 465, 87 S.Ct. 1776 and C. Wright, Law of Federal Courts

§ 58 (3d ed. 1976)) (footnote omitted)). "On occasion a federal court has looked to a decision of another federal court on a point on which there are no state precedents. If there are no holdings from state courts, high or low, or another federal court, on the matter that the federal court is to decide, it must look for other indicia of state law[.]" 19 Fed. Prac. & Proc. Juris. § 4507 (case citations omitted).

Addressing Ohio law, the United States Court of Appeals for the Sixth Circuit stated in *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir.1985), "[i]f the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it[,]" and the court considered as "available data" analogous cases and relevant dicta in Ohio Supreme Court cases, lower Ohio state court decisions, restatements of law, law review commentaries, decisions from other jurisdictions, and the " 'majority' " rule. *Id.* (internal citations omitted); *see also Valente v. Univ. of Dayton*, 689 F.Supp.2d 910, 916 (S.D.Ohio 2010) (" 'Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue.' The available data to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts, restatements of law, law review commentaries, and the 'majority rule' among other States." (internal citations omitted)), *aff'd*, 438 Fed.Appx. 381 (6th Cir.2011); *Washington Mut. Bank v. Chiappetta*, 584 F.Supp.2d 961 (N.D.Ohio 2008) ("When, as in this instance, the state's highest court has not decided the issue, the federal court must ascertain the state law from 'all relevant data.' All relevant data includes the state's intermediate court decisions, restatements of law, law review commentaries and decisions from other jurisdictions on the 'majority' rule.") (internal citations omitted).

Other United States Courts of Appeal also have indicated that, " 'In the absence of a controlling decision by the [New Jersey] Supreme Court, we must predict how it would rule if faced with the issue.' In making this prediction, we look to " 'decisions of state

intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue,' " as well as to " 'analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.' " " *Lomando v. United States,* 667 F.3d 363, 385 (3d Cir.2011) (quoting *Spence v. ESAB Grp., Inc.,* 623 F.3d 212, 216–17 (3d Cir.2010) (quoting *Norfolk S. Ry. Co. v. Basell USA Inc.,* 512 F.3d 86, 92 (3d Cir.2008))) (internal citations omitted); *see also Coll v. First Am. Title Ins. Co.,* 642 F.3d 876, 886 (10th Cir. 2011) (" 'Where no controlling state decision exists, [we] must attempt to predict what the state's highest court would do.... [We] may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law. Ultimately, however, the Court's task is to predict what the [New Mexico] [S]upreme [C]ourt would do. Our review of the district court's interpretation of state law is *de novo.*' " (quoting *Wade v. EMCASCO Ins. Co.,* 483 F.3d 657, 665–66 (10th Cir.2007) (internal quotation marks and citations in *Wade* omitted))) (brackets in original); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18–19 (2d Cir.2002) ("In interpreting state law, we 'look to the state's decisional law, as well as to its constitution and statutes.' Where New York law is unsettled, this Court is obligated to predict carefully how the state's highest court would resolve the uncertainty or ambiguity. In making this prediction, we give the 'fullest weight' to pronouncements of the state's highest court, while giving 'proper regard' to relevant rulings of the state's lower courts. 'We may also consider decisions in other jurisdictions on the same or analogous issues.' " (quoting *Santalucia v. Sebright Transp., Inc.,* 232 F.3d 293, 297 (2d Cir.2000)) (internal citations omitted)).

The Ohio state courts have not directly defined the phrase "party involved in a contemplated real estate transaction," and have rarely referenced the concept of "a contemplated real estate transaction." Two Ohio state cases have used the phrase, or something similar, however, neither of these cases is helpful to resolving the issues before the court. In the *Estate of Stockmaster,* No. 13–10–43, 2011 WL 2448980, at *1, 6 (Ohio Ct. App. June 20, 2011) (slip opinion), the Ohio appellate court discussed an option in a will which permitted one of the testator's sons to purchase property from the estate that had been willed jointly to all of the testator's children. Thus, the "real estate transaction contemplated by the Option" the court discussed, without offering a definition, involved both an identified buyer and seller. *Id.* at *6. In *Gunsorek v. Heartland Bank,* 124 Ohio App.3d 735, 707 N.E.2d 557 (1997), *appeal not allowed,* 81 Ohio St.3d 1526, 692 N.E.2d 1027 (1998), the Ohio appellate court referenced the New York case of *Backus Plywood Corp. v. Commercial Decal, Inc.,* 208 F.Supp. 687 (S.D.N.Y.1962), *aff'd in part, appeal dismissed in part,* 317 F.2d 339 (2d Cir.), *cert. denied,* 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963), stating that the court in the New York case had specifically distinguished "between oral partnership agreements that contemplate future real estate transactions with third parties and oral partnership agreements the very nature of which is a transfer of property from one partner to another." Neither case assists this court in defining "party involved in a contemplated real estate transaction." The court also has surveyed cases from other jurisdictions without locating definitions or interpretations that assist the court when trying to interpret the words "party involved in a contemplated real estate transaction."

Therefore, pursuant to the doctrine of *contra proferentem,* construing the language of the Contract less favorably to the defendant, the drafter of the Contract, the court accepts plaintiff's interpretation of Section 5.3.9 of the Contract and Ohio law as not requiring Ohio-licensed inspectors to perform the initial wood destroying organisms inspections. Accepting plaintiff's interpretation of the Contract between the parties and the application of Ohio law to the Contract is consistent with the interpretation adopted by the Ohio enforcement official. As noted

above, after interviewing Chapman employees, a state official with compliance oversight responsibility concerning wood destroying insect diagnostic inspections in Ohio found no fault with plaintiff's performance of the initial inspections for wood destroying organisms without the use of Ohio-licensed inspectors. Had HUD wanted to ensure that all inspections under the Contract be conducted by Ohio-licensed inspectors, as drafter of the Contract, it would not have been difficult for HUD to include the requirement in the Contract between the parties.

## CONCLUSION

For the foregoing reasons, defendant's motion for partial summary judgment is **DENIED.**

**IT IS SO ORDERED.**